**STATE**

v.

**Frank A. BERTRAM.**

**No. 90–128–C.A.**

Supreme Court of Rhode Island.

May 6, 1991.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., Annie Goldberg, Sp. Asst. Atty. Gen., for plaintiff.

David Cicilline, Providence, for defendant.

## OPINION

KELLEHER, Justice.

During the 1987 Christmas holidays, Thomas O'Gorman (O'Gorman), the executive housekeeper at the Holiday Inn at the Crossings in Warwick, Rhode Island, made a brief visit to the city of Chicago. Upon his return to the Holiday Inn, he made a special round of the premises to ensure that nothing had been left wanting in his absence. In one particular room he noticed "a faint odor" and asked the individual who had cleaned the room to go back there and clean it again.

On January 2 O'Gorman returned to the room to determine whether the problem had been corrected. Again he detected "the same faint odor," and in the company of an employee he began his own inspection. A search of the area behind the furniture and under the beds failed to reveal the source of the odor. As O'Gorman was walking out of the room, it became apparent that "the last place to look" was a luggage rack, a large, hollow, solid-birch box that was open at the bottom, wrapped in canvas and painted, and estimated to weigh more than one hundred pounds. As O'Gorman tipped the box away from the wall, a very strong odor became evident.

Suffice it to say, the birch box contained a body that was later identified to be that of sixteen-year-old Lori Leone. A pair of brown jeans was tied tightly around her neck. The medical examiner, who gave the cause of death as asphyxia due to strangulation, also estimated that Lori Leone had been dead "a few days to a week."

Hotel records established that in the week before the body was discovered, the room had been occupied by three sets of guests. On December 31, New Year's Eve, it was one of three rooms reserved by Warwick police officers and their wives to celebrate the arrival of a new year. Before that, from December 28 to 30, the room was occupied by a regional representative of a manufacturer of physical-therapy equipment; and before the representative's stay, just before midnight on December 26, the room was rented by an individual using the name Frederick Bricker of 36 Cornell Boulevard in Warwick, telephone number 781–9286, who supposedly drove a 1987 Chrysler with the license number ZX–940.

Further investigation revealed that the Cornell Boulevard address was fictitious and that the telephone number had belonged for many years to a retired man in Cranston who did not know anyone named Bricker. The registration number turned up under a different name and was carried in the Registry of Motor Vehicles files as "inactive, either lost or stolen within a year or so."

Further investigation indicated that "Frederick Bricker" had made one telephone call to an unlisted number belonging to Elaine Watson of 118 Arnold Avenue in Cranston, whose sister, Cheryl Bertram (Mrs. Bertram), had been living with her for a few weeks, along with her husband, Frank Bertram (Bertram).

At that time Bertram had a 1987 Chrysler registered to him but it was inoperative.

Instead Bertram and his wife had been driving another vehicle that had been leased in his wife's name in mid-November 1987 from Pride Chrysler–Plymouth, a dealer located in nearby Seekonk, Massachusetts. Of some passing interest is the fact that the Bertrams, along with a Stanley Ostrowski (Ostrowski), were riding in the rented vehicle on the night of December 27 when Ostrowski, their friend and employee, was stopped by the Providence police for speeding. All three were arrested, but the Bertrams were released; Ostrowski, a parolee, had held up a gas station the night before and was later identified from photos by an eyewitness. The rental vehicle was impounded and towed to a lot in Providence, where it remained until early January 1988, when the Warwick police were alerted to a possible link between the car and the Holiday Inn homicide. The car was towed to Warwick, and a fingerprint recovered from the window on the passenger side was matched to prints taken post mortem from the victim.

Cheryl Bertram aroused the suspicion of the police when she informed them that her husband and Ostrowski were with her all evening on December 26, the night of the murder, when, in fact, Ostrowski had already been identified as having been a participant in the gas-station robbery that evening. When this fact was pointed out to her, she changed her story.

Trial began approximately a year later. Mrs. Bertram invoked her Fifth Amendment privilege and refused to testify. Ostrowski became a witness for the prosecution, in exchange for the favorable disposition of his pending cases. He testified that Bertram told him on December 27 that he had "picked up a girl" the night before, that he had "end[ed] up taking her to the motel" in Warwick, and that when "something went wrong," he had strangled her. Ostrowski did testify that Bertram had ordered him to remove from the car articles belonging to the deceased, such as "clothes and shoes and a pocketbook and a pillow case." These articles were "dumped * * * in a garbage can [located] in Roger Williams Park." A handwriting expert also informed the jury that, in his opinion,

the individual who printed entries on four lines on the Holiday Inn's registration card was Bertram.

On appeal Bertram first challenges the denial of a motion to suppress evidence allegedly obtained without a warrant from the automobile leased by Mrs. Bertram after the vehicle had been impounded by the Providence police. As noted earlier, the driver, Ostrowski, was arrested for speeding on December 27, the night after the murder, and guns were found in the car. The Bertrams, who were with Ostrowski in the car, were also arrested but later released.

At the suppression hearing an employee at the impoundment lot testified that Mrs. Bertram had come to the premises to retrieve certain personal items from the impounded vehicle. Mrs. Bertram testified that she made no attempt to take the car at that point, even though, according to later testimony, she could have obtained a release to do so if she had paid the towing bill and presented the lease agreement.

Detective Mark Brandreth (Brandreth) of the Warwick police department testified that on January 4 Warwick police were notified by Providence police that Ostrowski and the Bertrams had been arrested in Providence on December 27 and that the vehicle had been impounded. Apparently the Warwick police were interested in the car because the occupant of the room in which the body was found had listed a late-model Chrysler on his registration card. Brandreth further testified that he and another officer went to the lot and asked the manager where the vehicle was located. After the manager identified the vehicle, Brandreth stated: "We went out and looked at the vehicle [and we] looked in the windows. The vehicle was secured. We looked in the windows and on the back floor observed a pair of ladies shoes, a towel or bath mat similar to what they use in hotels."

These observations further piqued the officers' curiosity because they knew the victim found at the hotel was a female and that no shoes had been found with her

body. At that point, Brandreth testified, they contacted the registered owner of the automobile, Pride Chrysler–Plymouth. Upon questioning by the officers, Raymond Monast (Monast), the dealership's manager, revealed that the car was currently being rented to Mrs. Bertram and was listed as "overdue." Monast further stated that he last heard from Mrs. Bertram in mid-December when she asked to keep the car "one more week" and that he had "not seen or heard from her since." Brandreth then asked Monast if it could be possible to remove the car to Warwick police headquarters and to have Monast meet officers there with a copy of the rental agreement. According to Brandreth, Monast "said absolutely; that he was looking for the car himself for lack of payment and we had all the right to take the vehicle as far as he was concerned."

That afternoon the car was towed to the Warwick police garage, and Monast brought a copy of the lease agreement with him to the station. A warrant to search the car was then prepared and signed that night, and the search was executed the following morning. The only evidence introduced from the search of the car was a fingerprint recovered from the passenger section of the vehicle. The print matched one of the victim's.

Bertram now asserts that the officers' peering through the windows of the leased auto at the lot constituted an illegal search, that the subsequent towing of the vehicle to the Warwick police department was an unreasonable seizure, and that the subsequently obtained warrant was invalid because it relied on an affidavit containing illegally gathered information. Bertram therefore requests that this court engage in a full-blown analysis of whether the fingerprint obtained from the vehicle should be excluded under the existing law of search and seizure.

■ Before such a request will be entertained by this court, however, a defendant must first demonstrate that he or she has an appropriate interest on which to base this request. In other words defen-

dants must first prove that they have standing to object to the validity of a search or seizure. Fourth Amendment rights are personal rights not to be asserted vicariously by a defendant merely because he or she may be aggrieved by the introduction of damaging evidence. *State v. Porter*, 437 A.2d 1368, 1371 (R.I.1981); *see also Rakas v. Illinois*, 439 U.S. 128, 133, 99 S.Ct. 421, 425, 58 L.Ed.2d 387, 394 (1978). Furthermore it is well settled that defendants assume the burden of establishing their standing to challenge the admissibility of the seized evidence. *Porter*, 437 A.2d at 1371; *State v. Cortellesso*, 417 A.2d 299, 301 (R.I.1980); *see also Rakas*, 439 U.S. at 130–31 n. 1, 99 S.Ct. at 424 n. 1, 58 L.Ed.2d at 393 n. 1.

Any complete discussion of the modern concept of standing must first begin with *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Prior to *Jones*, standing to contest an unlawful search was strictly limited to those persons who had either a proprietary or a possessory interest in the premises searched. In *Jones*, however, the Court substantially broadened this rule by establishing the concept of automatic standing for defendants charged with a possessory crime. *Id.* at 263–64, 80 S.Ct. at 732–33, 4 L.Ed.2d at 703–04. In addition *Jones* expanded the class of persons protected by allowing all persons legitimately on the premises to contest the validity of a search, in addition to those persons having a proprietary or a possessory interest in the premises.

■ Since *Jones* was decided, however, the Court's approach to issues of standing has undergone several major modifications. First, in *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259 (1968), the United States Supreme Court held that whenever a defendant testifies at a suppression hearing to contest the legitimacy of a search or seizure, his testimony may not be used against him at trial. *Simmons* thus remedied the very evil that the automatic-standing rule sought to correct.[1] Further-

---

1. Obviously then, the first ground set forth in   *Jones* for giving standing has been eliminated.

more in *Rakas* the Court retreated from its holding in *Jones* that any person "legitimately on the premises" has standing to challenge the admissibility of evidence seized thereon. The Court decided that this basis for standing was too "broad a gauge for measurement of Fourth Amendment rights" and therefore narrowed it to that class of persons with a legitimate expectation of privacy in the invaded place or in the evidence seized. *Rakas*, 439 U.S. at 142–43, 99 S.Ct. at 429–30, 58 L.Ed.2d at 400–01; *see also Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633, 642 (1980); *State v. Porter*, 437 A.2d at 1371. The Court presently utilizes a two-tier process for determining the existence of a reasonable expectation of privacy. *See California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 36 (1988). A court must first ascertain whether the defendant had a subjective expectation of privacy, and second, it must determine whether the defendant's subjective expectation of privacy is one that society accepts as objectively reasonable. *Id.*

Courts have long recognized that constitutionally protected privacy interests do exist in automobiles. *See, e.g., United States v. Martin*, 806 F.2d 204, 207 (8th Cir.1986). These interests, however, have traditionally received a lessened degree of constitutional protection than, for example, private homes because of their mobile nature and the fact that automobiles are widely regulated and are used publicly in everyday life. *Id.* Our inquiry must therefore focus on whether Bertram had a reasonable expectation of privacy in the vehicle rented by his wife.

It is worthy of repeating that in the controversy before us, Bertram was a passenger in an automobile leased by his wife and driven by Ostrowski when Ostrowski was stopped for speeding and the vehicle was later impounded. Although no case law exists in Rhode Island that is directly in accord with the facts before us, other jurisdictions, whose reasoning will be of assistance to us here, have addressed the issue of whether a nonlessee passenger in a rented vehicle has standing to object to a search of that vehicle.

In addition to considering a defendant's subjective expectation of privacy and the objective reasonableness of that expectation, courts also consider other factors in determining standing including, but not limited to, ownership, possession, and/or control of the vehicle; historical use of the property searched or the thing seized; ability to regulate access to the vehicle or exclude others from use; and the totality of the surrounding circumstances. *See United States v. Aguirre*, 839 F.2d 854, 856–57 (1st Cir.1988). Applying these factors to the facts before us, we are of the opinion that Bertram had no standing to object to the search of the vehicle.

We first examine whether Bertram had a subjective expectation of privacy in the place searched or the evidence seized. Scant evidence exists in the record that indicates whether Bertram had such subjective expectation. Ostrowski did testify that Bertram directed him to clean out some "stuff in the car" belonging to the girl, namely, "clothes and shoes and a pocket book and a pillow case." It could also be argued that Bertram had a subjective expectation of privacy in the fingerprint taken from the window that was later used against him. Although Bertram may have had a subjective expectation of privacy, the evidence in the record indicates, at most, that Bertram merely intended to prevent discovery of any evidence linking him to the victim. For Fourth Amendment purposes, however, it is generally recognized that "a legitimate expectation of privacy means more than a subjective expectation of keeping incriminating evidence hidden." *United States v. Thornley*, 707 F.2d 622, 624 (1st Cir.1983).

Even if we assume that Bertram had a subjective expectation of privacy, this expectation, viewed objectively, must be rea-

---

Indeed, in *United States v. Salvucci*, 448 U.S. 83, 89–90, 100 S.Ct. 2547, 2551, 65 L.Ed.2d 619, 626 (1980), the Court expressly overruled the con-cept of automatic standing established in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

sonable. Beginning with any alleged ownership, possessory, or control interest Bertram had in the vehicle, the record clearly indicates that neither Bertram nor his wife owned the vehicle since it was being leased by Mrs. Bertram from an automobile dealership. Although Mrs. Bertram testified that she rented the vehicle for both herself and Bertram and Bertram had permission to use the car on occasion,[2] the paucity of this evidence alone is not sufficient to establish that Bertram had an objectively reasonable expectation of privacy in the vehicle. Indeed, there is no evidence in the record of the pretrial suppression hearing concerning the frequency of Bertram's use of the car, his right to control the car, his ability to exclude others from using the car, and the like. *See United States v. McHugh,* 769 F.2d 860, 864 (1st Cir.1985), *aff'g,* 575 F.Supp. 111 (D.R.I.1983). Indeed, on the evening the car was impounded, Bertram was a passenger in the car when Ostrowski was stopped for speeding. Although it is safe to say that Bertram realized that an automobile traveling in excess of the speed limit might attract police attention, Bertram apparently did nothing to control Ostrowski's conduct or to demand control of the vehicle for himself prior to their apprehension by the police.

Furthermore we believe the fact that Mrs. Bertram leased the vehicle, her name alone appears on the rental agreement, is of considerable importance. Other courts have placed great emphasis upon this factor as well. For example, in *United States v. Obregon,* 573 F.Supp. 876, 879 (D.N.M.1983), *aff'd,* 748 F.2d 1371 (10th Cir.1984), the court pointed out:

"Defendant had the keys to the car and may have had permission from the renter of the car to use it, but this is not determinative of the standing inquiry * * *. Defendant was driving a rented vehicle and was not named on the rental agreement or any other documents, either as a renter or an authorized driver. Defendant made no showing that any arrangement had been made with the rental car company that would have allowed him to drive the car legitimately."

The court concluded that the defendant's relationship to the rented car was too attenuated to support a claim of standing. 573 F.Supp. at 879. Under similar facts, other courts are in accord with this result. *See, e.g., United States v. Pino,* 855 F.2d 357, 360 (6th Cir.1988); *United States v. Aguirre,* 839 F.2d 854, 857 (1st Cir.1988); *United States v. Taddeo,* 724 F.Supp. 81, 83 (W.D.N.Y.1989); *United States v. Morales,* 676 F.Supp. 560, 565 (D.Del.1987), *rev'd and remanded on other grounds,* 861 F.2d 396, 398 (3d Cir.1988).

Here, as in *Obregon,* Bertram had permission to use the car on occasion, and his wife apparently relinquished the only set of keys to the automobile to him on these occasions. This, however, does not diminish the importance of the fact that Bertram, according to the rental agreement, had no authority from the true owner to drive the vehicle, nor did Bertram make any showing that he and the dealership made an arrangement whereby Bertram could legitimately drive the vehicle. Furthermore, unlike the defendant in *Obregon,* Bertram was not even driving the automobile when it was stopped but, rather, was merely a passenger at the time. It is also noteworthy that the rental agreement signed by Mrs. Bertram specifically forbade, "under any circumstances [the] surrender [of] the rented vehicle to any person other than those" specifically listed on the rental agreement, on which Bertram's name is nowhere to be found. *See United States v. Taddeo,* 724 F.Supp. at 83. Hav-

---

**2.** Mrs. Bertram testified as follows at the pretrial suppression hearing:

"Q: And did you have occasion at some point in late 1987 to lease a car from Pride Chrysler?
"A: Yes, I did.
    *    *    *    *    *    *
"Q: And was that car you leased for yourself or for you and your husband?

"A: For me and my husband.
"Q: And was that vehicle used jointly by you and your husband?
"A: Yes it was.
"Q: Was there a single set of keys for that vehicle or two sets?
"A: Single."

ing reviewed the foregoing circumstances involving Bertram's use of the vehicle leased by his wife, we are of the opinion that Bertram had no legitimate expectation of privacy in the vehicle and therefore lacks standing to contest the validity of the search of the vehicle.

Bertram next contends that the trial court committed plain error in ordering him to provide handwriting exemplars for use against him at trial. A major factual issue at trial involved the question of authorship of the entries handprinted on the Holiday Inn registration card on December 26 by the occupant of the room in which the body of the victim was to be found who signed his name as "Frederick Bricker" and listed a nonexistent address in Warwick as his residence. Relying on the exemplars, a handwriting-analysis expert later testified that it was his opinion that the individual who printed entries on the four lines on the Holiday Inn registration card was indeed Frank Bertram.

The prosecution moved before trial for leave to obtain samples of Bertram's handwriting. Bertram concedes that the motion was granted without opposition, and the handwriting samples were provided without objection.

Bertram now claims that the granting of this motion violated his right against self-incrimination under the Rhode Island Constitution.[3] Notwithstanding the absence of an objection below, Bertram claims he is entitled to a determination of his constitutional claim under *State v. Burke*, 522 A.2d 725, 731 (R.I.1987). In *Burke* we stated that "this court's review of questions concerning basic constitutional rights, notwithstanding a defendant's failure to raise the issue at trial, is limited to the following circumstances. First, the error complained of must consist of more than harmless error. Second, the record must be sufficient to permit a determination of the issue. Third, counsel's failure to raise the issue at trial must be due to the fact that the issue is based upon a novel rule of law of which

counsel could not reasonably have known at the time of trial." *Id.*

Even if we assume that Bertram has satisfied the showing required under the *Burke* test and is entitled to have his constitutional claim heard by this court, we believe his argument must fail on the merits in light of our past treatment of article 1, section 13, of the Rhode Island Constitution in relation to the Fifth Amendment to the United States Constitution.

As Bertram correctly suggests, there is no question that states may, in applying provisions of their constitutions or state charters, afford their citizens greater protection and security than is provided under the United States Constitution. *See, e.g., Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967). An examination of Rhode Island case law, however, reveals that this court has seldom, if ever, afforded criminal or civil defendants greater protection under article 1, section 13, of our State Constitution than has been afforded to criminal or civil defendants under the Fifth Amendment to the United States Constitution.

Protections under article 1, section 13, of the Rhode Island Constitution have uniformly been interpreted as tantamount to those available under the Federal Constitution in matters relating to, for example, *Miranda* rights and waiver of those rights, the right against self-incrimination in civil trials, and a prosecutor's or judge's inability to comment adversely on a criminal defendant's failure to testify. See, *e.g., State v. Malone*, 568 A.2d 1378 (R.I.1990); *State v. Ferola*, 518 A.2d 1339 (R.I.1986); *Pulawski v. Pulawski*, 463 A.2d 151 (R.I.1983); *State v. Fontaine*, 113 R.I. 557, 323 A.2d 571 (1974); *State v. Sherman*, 113 R.I. 77, 317 A.2d 445 (1974).

In his brief Bertram readily concedes that it "is well established that compelling an accused to provide handwriting exemplars for use by the prosecution against him does not violate the protections of the Fifth Amendment to the Constitution of the United States." Indeed, the Supreme Court of

---

**3.** Article 1, section 13, of the Rhode Island Constitution states, "No person in a court of common law shall be compelled to give self-incriminating evidence."

the United States directly addressed the issue in *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). There, responding to the petitioner's claim that the taking of handwriting exemplars violated his right against self-incrimination under the Fifth Amendment, the Supreme Court opined:

> "The taking of the exemplars did not violate petitioner's Fifth Amendment privilege against self-incrimination. The privilege reaches only compulsion of 'an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers,' and not 'compulsion which makes a suspect or accused the source of "real or physical evidence" * * *.' * * * One's voice and handwriting are, of course, means of communication. It by no means follows, however, that every compulsion of an accused to use his voice or write compels a communication within the cover of the privilege. A mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its protection. * * * No claim is made that the content of the exemplars was testimonial or communicative matter." *Id.* at 266–67, 87 S.Ct. at 1953, 18 L.Ed.2d at 1182–83.

Bertram urges this court to follow the path that courts in other jurisdictions have taken with self-incrimination provisions similar to ours. Those courts, liberally construing those provisions, have held that it is unconstitutional to compel an accused to give virtually *any* incriminating evidence, whether it be real, physical, or testimonial, that will be used against him or her in court. We decline Bertram's invitation to journey down this path.

■ This court, like the United States Supreme Court, has traditionally distinguished between physical evidence and testimonial evidence when undertaking a self-incrimination analysis under article 1, section 13. For example, in *State v. DeCesare*, 68 R.I. 32, 35, 26 A.2d 237, 238 (1942),

we held that compelling a defendant, at the state's request, to stand up in court during trial for purposes of physical identification did not deprive the defendant of his constitutional protection against self-incrimination. Similarly, in *State ex rel. Widergren v. Charette*, 110 R.I. 124, 132, 290 A.2d 858, 862 (1972) (citing with approval *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)), we espoused the view that a motorist's privilege against self-incrimination was not violated by the introduction into evidence of the results of a breathalyzer test submitted to by him. In short, these cases express the view that Rhode Island's self-incrimination prohibition was directed more toward preventing the use of compelled testimonial, rather than physical, evidence against the accused. In accord with this reasoning, we believe that compelled production of handwriting exemplars by an accused does not violate the prohibition against self-incrimination contained in article 1, section 13, of the Rhode Island Constitution.

We need not linger long over Bertram's next contention. At trial, two photographs of the victim were allowed into evidence despite a strenuous objection by defense counsel. One of the photographs was described by Bertram's attorney as "a horribly gruesome photograph of the deceased both in an unclothed position and obviously decomposing significantly." This photograph of the deceased was taken in the hotel room in which the body was found. The second photograph was introduced through the victim's mother and depicted, again in defense counsel's words, "a very pretty, young sixteen year old girl."

Bertram now contends that the trial justice erred in allowing the photographs into evidence because, first, they were not probative of any material issue in this dispute and, second, even if they were probative, any probative value they may have had was outweighed by the danger that the photographs would unfairly inflame the passions of the jury.

The exclusion of relevant evidence on the ground of prejudice is governed by Rule 403 of the Rhode Island Rules of Evidence,

which provides, in relevant part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." When applying this rule, this court has repeatedly determined that the "general rule is that the question of the materiality or relevancy of photographs is a matter of judicial discretion." *State v. Ware*, 524 A.2d 1110, 1113 (R.I.1987). The role of the appellate court is to "review the record and to determine whether the trial justice carefully considered whether the probative value of the evidence was outweighed by undue prejudice, 'keeping in mind that even if the evidence offered is of a gruesome nature and might tend to influence the jury unduly, it may nevertheless be admissible if it is otherwise material and competent.' " *State v. Griffin*, 567 A.2d 796, 801 (R.I.1989) (quoting *Ware*, 524 A.2d at 1113).

With respect to Bertram's contention that the photographs lacked relevancy and were offered for the sole purpose of inflaming the jury, we have stated before that in murder cases, photographs may be admitted for a number of relevant purposes including, but not limited to, serving as proof of the corpus delecti, displaying the extent of the victim's injuries, identifying the body and its condition, or bearing on the atrociousness of the crime. *Ware*, 524 A.2d at 1113. At trial the prosecution, when arguing in favor of admission of the photographs at side bar, succinctly stated the purpose of their introduction: "[The state has] an obligation to prove that someone was killed and that it was a homicide * * *. [I] have an obligation to at least let them see that there was some decomposition because I anticipate testimony from the medical examiner [that] this young girl had been dead for some period of time and I think the jury ought to have the opportunity to see [this murder] just didn't happen [recently]." Clearly then, the photograph of the deceased victim was relevant for proving death and the amount of time that had elapsed since the murder occurred.

Although the second photograph was not gruesome in nature, Bertram nonetheless claims that its introduction unfairly prejudiced him because it made the jurors acutely aware of how young the victim was at the time of her demise and might "arouse some sympathy and make them feel bad for the victim." Bertram overlooks the fact, however, that the identity of the victim was an element in the state's case and that, as such, the burden rested on the prosecutor to prove identity. The photograph was germane in proving or disproving the guilt of Bertram in relation to the murder charge against him and was therefore admissible into evidence for that purpose.

We must next determine whether the trial justice abused his discretion by allowing in the relevant photographs despite the countervailing danger of unfair prejudice. When reviewing whether a trial justice has given due consideration to the issue of whether probative value of the evidence is outweighed by undue prejudice, we must keep in mind that if the photographs, like those before us, are competent evidence relating to a material issue and are not offered solely to inflame the jury's passions, it is of no concern that a photograph may be unpleasant to view or that it may have an influence beyond the strict limits of the purpose for which it was introduced. *Ware*, 524 A.2d at 1113. If we were to proscribe the introduction of photographs of murder victims whenever they tended to be prejudicial in any way whatsoever, few, if any, such photographs would be allowed into evidence because, indeed, it taxes this court's imagination to conceive of an instance wherein a photographic depiction of the grim face of death would play pleasingly on the eye of a beholder. To be unduly prejudicial, the photograph must be "of such a nature as to inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt." *State v. Fenner*, 503 A.2d 518, 526 (R.I. 1986).

Relying on the foregoing standards, we are of the opinion that the trial justice did not err in allowing the photographs into evidence. Although the trial

justice conceded that the photograph of the deceased was somewhat gruesome, it was the least gruesome of those available and was material and competent to show proof of death and the amount of time elapsed between discovery of the body and the murder. Similarly, we believe the trial justice was within his sound discretion in concluding that the photograph depicting the victim as a "young 16 year old girl" was probative regarding the victim's identity and did not unduly inflame the jurors' emotions. For these reasons the ruling of the trial justice on this issue will not be disturbed.

Bertram also takes exception to a ruling by the trial justice concerning the testimony of an expert witness. More specifically, Bertram claims that the "trial court erred in allowing a document examiner to testify about the signature on a hotel registration card when the witness was not able to identify that signature to a reasonable degree of scientific certainty."

The controversial expert testimony was that of Inspector Thomas J. Donovan (Donovan), a document analyst who was then director of the Postal Inspection Service Crime Laboratory in New York City. Donovan was qualified without objection as an expert in the field of questioned documents and document analysis. Donovan stated that, in his opinion, the printed entries on the Holiday Inn registration form and receipt, including the printed name Frederick Bricker, were written by Bertram. Donovan also concluded that the signature on the Holiday Inn registration form "conceivably could have been written by Frank A. Bertram."

Donovan's conclusions were based on a comparison of the Holiday Inn registration form, handwriting exemplars produced by Bertram, and a registration form from the Susse Chalet motel in Seekonk, Massachusetts, that had been completed earlier by Bertram on December 27, 1987, in his own name. At trial Donovan demonstrated by means of an enlargement how the handprinting on the Holiday Inn registration form compared with the printing known to have been done by Bertram using his own

name on the Susse Chalet registration form. The record reveals that Donovan's testimony was replete with a litany of the idiosyncratic characteristics of Bertram's printed name and how printed words on each of the registration forms shared those characteristics. With respect to the handwritten signature on the Holiday Inn form, however, Donovan stated that he was less certain regarding its authorship because, although it bore "some similarity" to Bertram's signature in his own name in the "normal course of business" on the Susse Chalet form, the handwriting Bertram supplied in his exemplars "was not written fluently as his own writing" and "varie[d] immensely in the two sets of writings."

Because of this uncertainty, therefore, Donovan claimed that it was "conceivable that it could have been written" by Bertram. Questioning of Donovan by the court at trial reveals what level of certainty "conceivable" denotes in the field of handwriting analysis:

"Q. * * * Now, in degrees of certainty, do you have varying degrees?

"A. Yes.

"Q. What is conceivable?

"A. It's on the positive side, but not too high.

"Q. And what is after conceivable?

"A. Probable, highly probable and identified going up the ladder.

"Q. That's the bottom of the spectrum, conceivable.

"A. And common authorship would be less than that.

"Q. So, you cannot say to a degree of scientific certainty in your field of endeavor that this, in fact, was the handwriting of Mr. Bertram?

"A. Not based on what I had at that time. That was the signature, not the handprinting."

Relying on this testimony, Bertram claims that the trial justice erred in allowing into evidence any of Donovan's testimony concerning the signature.

Bertram's claim, however, is not a novel one in this jurisdiction. Similar arguments have been raised before in cases dealing with expert opinion relating to physical evi-

dence. For example, in *State v. Vargus*, 118 R.I. 113, 373 A.2d 150 (1977), the defendant raised an identical argument on appeal when seeking to reverse the trial justice's allowance of a hair-analysis expert's testimony on the identity of hairs found in a ski mask. Arguing that the expert's opinion was inadmissible to show that hairs taken from the defendant were the same as those found in the ski mask, the defendant asserted "that because of the weight likely to be accorded expert testimony by a jury, an expert must be able to testify to a reasonable scientific certainty or high probability before his testimony will be admissible in evidence." *Id.* at 126, 373 A.2d at 156.

▮▮▮ Rejecting the defendant's argument, we held that such expert testimony, though not providing identification to a "scientific certainty," was nevertheless admissible. *See Vargus*, 118 R.I. at 127, 373 A.2d at 157; *see also State v. Brennan*, 526 A.2d 483, 489 (R.I.1987). Rather, the degree of conclusiveness that characterizes the testimony of a witness, properly qualified to give his or her opinion as an expert, goes only to the weight and not to the admissibility of the evidence. *Vargus*, 118 R.I. at 127, 373 A.2d at 157. When assessing the utility of an expert's testimony, the jury is always free to accept, to reject, or to accord any amount of weight it chooses to that expert's testimony. *Id.*

▮▮▮ In the instant case Donovan positively identified the handprinting on the Holiday Inn registration form as belonging to Bertram. The signature "conceivably" could have been written by Bertram, although, as Donovan stated, he could by no means say that the signature was in fact Bertram's. At trial, counsel for defense had ample opportunity to cross-examine Donovan on his conclusions and emphasize any infirmities pertaining to his analysis of the signature. The jury could then decide what weight, if any, should be accorded to the testimony. We conclude, therefore, that the trial justice did not err in allowing Donovan's remarks into evidence.

▮▮▮ Bertram's next claim of error relates to the reliability of an identification of Bertram made by one of the state's witnesses while sitting in a courthouse corridor prior to trial. Brenda Choquette (Choquette) was in the employ of the Susse Chalet motel in Seekonk, Massachusetts, as a desk clerk on December 27, 1987. On that day, Bertram registered for a room in his own name at the Susse Chalet while Choquette was on duty. Choquette requested that Bertram produce some form of positive identification in addition to the information he supplied on the room-registration form. Bertram provided Choquette with his driver's license, whose number Choquette duly recorded.

As was mentioned earlier, the Susse Chalet registration form had significant evidentiary value since the state, through the testimony of a handwriting expert, was able to show that the man who printed "Frederick Bricker" on the Holiday Inn registration form was indeed the same man, Bertram, who printed his name on the Susse Chalet form. The Susse Chalet registration form gained attention when a key to the room at the Susse Chalet was found in Ostrowski's belongings, who was then residing at the Adult Correctional Institutions following his gas-station robbery. Although the robbery investigation began separately, details uncovered in the Holiday Inn investigation revealed Ostrowski's acquaintance with Bertram. Subsequently Warwick detectives interviewed Choquette at the Susse Chalet, and at that point Choquette showed the detectives the registration form completed by Frank Bertram. At that time, however, Choquette was unable to identify Bertram from photographs proffered by the detectives.

The state later subpoenaed Choquette to testify at trial concerning her entries on the Susse Chalet registration form. While waiting in a courthouse corridor to be called, Choquette spotted Bertram. As she explained at trial, "I was sitting in the hallway and I was just studying and there was a lot of people walking back and forth and the gentleman walked by and I recognized him," the gentleman, of course, being Bertram. Immediately thereafter, Choquette approached a Warwick police officer

and inquired whether she "should tell anybody" about her recent observations. When the incident was brought to the attention of the court, a voir dire examination of the witness in the jury's absence ensued. After listening to Choquette's testimony, the trial justice concluded that the identification occurred by chance, without suggestion by the Warwick police or the prosecution, and that Choquette "made a spontaneous observation" while sitting alone in the courthouse corridor. The trial justice further proclaimed that the spontaneous identification was "not a one-on-one, but [rather, occurred in] a multi-person hallway." The trial justice, denying Bertram's motion to suppress Choquette's identification, allowed Choquette to "testify to that effect" and ruled that any questions concerning the reliability of her identification would go to the weight of the evidence rather than to its admissibility.

Bertram now asserts that the trial justice's ruling on this issue constitutes reversible error. It is a well-settled principle in this jurisdiction that when reviewing a trial justice's decision on a motion to suppress, the duty of the appellate court is to view the evidence in the light most favorable to the government and apply the "clearly erroneous" rule. *State v. Beaumier*, 480 A.2d 1367, 1375 (R.I.1984). Applying this standard to the present facts, we believe Bertram's arguments must fail.

In support of his position, Bertram urges this court to focus its attention on several decisions dealing with the reliability of pretrial identifications. *See, e.g., Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (pretrial police station showup); *see also Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *State v. Parker*, 472 A.2d 1206 (R.I.1984) (all dealing with pretrial identification by means of photograph or photographic arrays). We believe, however, that Bertram's reliance on those cases is misplaced. There the defendants claimed that the procedures used by the police in the identification process—police lineups, showups, or photographic identifications—were so un-necessarily suggestive and conducive to irreparable mistaken identification that the defendants' due-process rights were violated. It is important to note that in each of the cited cases, some form of police action was involved in the identification procedures through which the witnesses identified the defendants and the undue suggestiveness of those very procedures formed the bases of the defendants' protestations. Quite to the contrary, the record in the present controversy is bereft of even a scintilla of evidence that tends to indicate that the actions of the police or the prosecution impermissibly influenced Choquette's identification. The decisions referred to by Bertram therefore are of little assistance to us here.

We believe the facts now before us are more akin to those found in *State v. Pailin*, 576 A.2d 1384 (R.I.1990). There too, the defense moved to suppress an in-court identification by the witness because the witness's only identification of the defendant prior to trial occurred as a result of a courthouse confrontation. *Id.* at 1388. As we explained:

> "The encounter occurred * * * when the witness reported to the Frank Licht Judicial Complex pursuant to a subpoena from the Office of the Attorney General. He reported to the Attorney General's office on the second floor of the Licht Complex and then went for a walk upstairs to the third floor. Pailin testified that he was waiting outside courtroom 12M on the third floor when the witness approached him and said, 'How you doing, Stephen.' Pailin did not respond * * *. A few minutes later the prosecutor arrived on the scene and conversed with the witness, and they both returned to the Attorney General's Office." *Id.* at 1388–89.

We concluded that the record supported the trial justice's denial of Pailin's motion to suppress because the meeting between Pailin and the witness was an "accidental encounter" and was not orchestrated or contrived by the police or the prosecution. *Id.* at 1389. Under comparable factual patterns, other cases in this jurisdiction are in

accord. *See, e.g., State v. Manocchio,* 497 A.2d 1, 10 (R.I.1985).

Similarly, Choquette's confrontation with Bertram in the courthouse corridor was also an accidental encounter. Although she was at the courthouse pursuant to a subpoena from the Attorney General's office, there is no evidence in the record indicating that her confrontation with Bertram was orchestrated by the prosecution or the police. Indeed, it would not be an exercise in overstatement to say that the record is devoid of any evidence tending to indicate that Choquette's encounter with Bertram was the result of anything other than sheer happenstance. We conclude that the trial justice did not err in denying the motion to suppress the identification.

Bertram also finds error in a ruling of the trial justice ordering Bertram to provide the prosecution with letters written by Ostrowski to Bertram's wife. At trial Bertram's counsel quoted portions of these letters while cross-examining Ostrowski in order "to establish the witness' bias, motive to be untruthful, and his fear of returning to jail." When the prosecution later asked to examine the letters to prepare for redirect examination, defense counsel voiced a "strenuous objection." Despite Bertram's protestations the court ordered Bertram, "in the interest [of] balancing justice," to release to the prosecution any letters written by Ostrowski, whether or not they were expressly mentioned in cross-examination.

There are three aspects to Bertram's attack on the trial justice's ruling on this issue. Bertram first argues that the disclosure violated his privilege against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution and article 1, section 13, of the Rhode Island Constitution. Second, according to Bertram, compelled disclosure of the letters abridged his attorney-client privilege. Finally Bertram avers that disclosure of the letters deprived him of the effective assistance of counsel as guaranteed under both the Federal and the State Constitutions.

Bertram's contentions concerning the privilege against self-incrimination under the Federal and the State Constitutions do not require extended consideration. As we noted earlier, because defendants have traditionally been afforded the same rights against self-incrimination under the Rhode Island and the United States Constitutions, our analysis will pertain to both provisions against self-incrimination. At the outset, we do not believe that Bertram has standing to object to the use of Ostrowski's letters on the basis of either the Fifth Amendment or article 1, section 13. Undoubtedly, Ostrowski as a witness, by invoking his rights against self-incrimination, could refuse to provide incriminating testimonial evidence that might then be used against him in a criminal prosecution. *See State v. Ahmadjian,* 438 A.2d 1070, 1076 (R.I.1981). As was mentioned earlier when considering Bertram's Fourth Amendment rights, however, Fifth Amendment rights too are inherently personal and may not be asserted vicariously. *In re Grand Jury Proceedings,* 814 F.2d 61, 66 (1st Cir.1987). The right cannot be invoked or waived by anyone but the person to whom the right attaches, for "the Fifth Amendment privilege is a *personal* privilege: it adheres basically to the person, not to the information that may incriminate him." *Couch v. United States,* 409 U.S. 322, 328, 93 S.Ct. 611, 616, 34 L.Ed.2d 548, 554 (1973). Therefore, absent a relationship of privilege, there can be no Fifth Amendment claim on which to assert standing. *In re Grand Jury Proceedings,* 814 F.2d at 66.

Here Bertram was not the author of the letters. Quite simply then, since Bertram did not write the letters and the statements contained therein could not be attributed to him, production of the letters did not compel Bertram to "bear witness 'against himself.'" "Compulsion upon the person asserting [the privilege] is an important element of the privilege, and 'prohibition of compelling a man * * * to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from *him.*'" *Couch,* 409 U.S. at 328, 93 S.Ct. at 616, 34 L.Ed.2d at

554. Furthermore, it may well be true that Bertram's attorney obtained possession of Ostrowski's letters and that some of the statements contained therein adversely affect Bertram's case. The mere existence of these facts, however, does not magically transform Ostrowski's letters into incriminating testimonial evidence that Bertram had the ability to exclude. The constitutional prohibition applies only to compelled incriminating testimony from the accused *himself*—"it necessarily does not proscribe incriminating statements elicited from another." *Id.* We therefore conclude that the compelled disclosure of Ostrowski's letters did not violate Bertram's right against self-incrimination under either the Federal or the State Constitution.

■■■■■ Bertram's assertion that the compelled disclosure of the letters abridged his attorney-client privilege is equally unmeritorious. We have said that " '[t]he attorney-client privilege protects from disclosure only the confidential communications between a client and his or her attorney.' " *State v. von Bulow*, 475 A.2d 995, 1004 (R.I.1984). " 'The general rule is that communications made by a client to his [or her] attorney for the purpose of seeking professional advice, as well as the responses by the attorney to such inquiries, are privileged communications not subject to disclosure.' " *Id.* With these standards in mind, we cannot see how Ostrowski's letters would fall within the ambit of the attorney-client privilege in existence between Bertram and defense counsel since they clearly are not confidential communications between Bertram and his attorney made for the purpose of seeking or rendering professional advice. Similarly, since Ostrowski penned the letters, the "work product" doctrine articulated in *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 393, 91 L.Ed. 451, 462 (1947), does little to further Bertram's cause since production of Ostrowski's letters did not constitute an "inquir[y] into the files and the mental impressions" of Bertram's attorney by the prosecution.

■■■■ Finally Bertram argues that "the order of the trial court that the defense furnish the prosecution with copies of the letters * * * denied Bertram the effective assistance of counsel" as guaranteed under both the Federal and the State Constitutions. We tend to think otherwise. As Bertram correctly points out, it is well established that the "right to the effective assistance of counsel necessarily includes the obligation of counsel to interview witnesses, collect evidence, and confer with his or her client." Bertram proceeds to cite several cases in which courts recognized the principle "that a surreptitious invasion by a government agent into the legal camp of the defense may violate the protection of the Sixth Amendment." *Hoffa v. United States*, 385 U.S. 293, 306, 87 S.Ct. 408, 416, 17 L.Ed.2d 374, 384 (1966); *see also Caldwell v. United States*, 205 F.2d 879 (D.C. Cir.1953). In cases where such violations have been found, surreptitious government action impermissibly allowed the government to gain access to the planning of the accused's defense prior to trial, thereby vitiating any attempts by the defendant and his attorney to formulate a trial strategy without intrusion upon their confidential relationship by an agent of the government. There is little doubt that such egregious government conduct violates the accused's right to present a defense with the assistance of counsel.

■■■ The principles enunciated in these cases, however, are inapposite to the facts presently before us. The prosecution did not, through clandestine activities, in any way infiltrate "the legal camp of the defense." Rather the prosecution merely sought, during the course of the trial, to inspect the letters used in court by Bertram's counsel while cross-examining Ostrowski. In the interest of fairness and justice, the trial court properly allowed the prosecution to acquire copies of the body of letters to which reference was made by Bertram's counsel and to question Ostrowski regarding their content. We fail to see how the trial justice's actions in any way impaired Bertram's right to effective assistance of counsel.

Bertram's final contention concerns the trial justice's denial of his motion for a new

trial. Bertram contends that the "trial court erred both in ruling that the verdict was not infirm and by applying the incorrect standard of law in arriving at the verdict."

When this court reviews a trial justice's ruling on a motion for a new trial, this court has repeatedly stated that such ruling is entitled to great weight and will be disturbed only when the trial justice overlooked material evidence or was otherwise clearly wrong. *State v. Girouard,* 561 A.2d 882, 890 (R.I.1989) (citing *State v. Henshaw,* 557 A.2d 1204, 1207 (R.I.1989); *State v. LaPointe,* 525 A.2d 913, 914 (R.I. 1987)); *see also State v. Grundy,* 582 A.2d 1166, 1172 (R.I.1990).

When "considering a motion for a new trial, a trial justice assumes the role of a superjuror because of his or her more experienced judgment." *Girouard,* 561 A.2d at 890. The trial justice must engage in at least three analyses when ruling on a motion for a new trial. *Id.* In the first analysis the trial justice must consider the evidence in light of the charge given the jury, which charge is presumably correct in regard to the law and fair to the defendant. *Id.* at 890–91. In the second analysis the trial justice must determine his or her own opinion of the evidence: what weight and credibility does he or she give to the witnesses and other evidence and what conflicting testimony and evidence does the trial justice accept or reject. *Id.* at 891. In the third analysis the trial justice, in his or her independent assessment of the evidence and in light of the charge to the jury, determines whether he or she would have reached a different result from the one the jury reached. *Id.* If the trial justice concurs with the jury, then at that point the motion for a new trial should be denied and the trial justice's obligations in ruling on the motion for a new trial are complete. *Id.*

Applying these standards to the trial justice's actions here, we are of the opinion that Bertram's motion for a new trial was properly denied. The trial justice first considered the evidence and his jury instructions and the applicable law. The trial justice next undertook an examination of twenty-one witnesses the prosecution called, noting that some "were extremely germane to the issues" whereas others "were merely building the foundation" for "the pertinent witnesses." Our thorough examination of the record reveals that, in accordance with the standards set forth in *Girouard,* the trial justice reviewed the testimony of each of the witnesses and made findings concerning the weight and the credibility of the testimony elicited from each witness.

Bertram, however, in his brief, artfully argues that the trial justice erred in accepting *any* of Ostrowski's testimony and this error, combined with the jury instruction "that circumstantial evidence should be afforded the same consideration as direct evidence," presented "a substantial danger" that the jury misapplied the instruction and returned a verdict that "had no basis in fact." We find this argument to be devoid of merit.

The trial justice pointed out that he was "aware of the consideration given" to the witness by the state in exchange for his testimony but noted that the jury knew of this fact and would consider it in light of the charge given on "how they should and how they could weigh his testimony." Although the trial justice, as did the jury, found portions of Ostrowski's testimony to be suspect, other evidence in the case corroborated some of Ostrowski's remarks, lending "credence and credibility" to his testimony on certain "pertinent point[s]."

With regard to the jury instruction of which Bertram complains, it is well settled under Rhode Island law "that no valid distinction exists between the probative force of circumstantial and of direct evidence." *State v. Caruolo,* 524 A.2d 575, 584 (R.I. 1987). Whether the evidence is circumstantial or direct, the task for the jury is "to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." *Id.* (quoting *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150, 166–67 (1954)). With this understanding in mind, a trial justice, when

presented with a motion for a new trial, must determine whether the evidence adduced at trial was sufficient to support the jury's verdict of guilt beyond a reasonable doubt. 524 A.2d at 585. Having assessed the weight and the credibility of the testimony presented, including both corroborating and conflicting evidence, the trial justice ruled that the jury, drawing reasonable inferences from the testimony deemed credible, was correct in finding defendant guilty of first-degree murder beyond a reasonable doubt. In so ruling, we do not believe that the trial justice either overlooked or misconceived any material evidence or was otherwise clearly wrong.

■■ In faulting the trial justice's denial of his motion for a new trial, Bertram's counsel also directs our attention to the trial justice's final comments as he denied the motion:

"Weighing all the evidence independently the Court finds that the jury responded to the evidence and to the charge as given to them and * * * the verdict was based on clear and convincing evidence * * * [T]his Court * * * as the thirteenth juror * * * if it were sitting without a jury would reach the same conclusion the jury reached and accordingly, the defendant's motion for a new trial is denied."

Placing great emphasis on the trial justice's reference to "clear and convincing evidence," Bertram's counsel reminds us that the state's burden in a criminal trial is to prove the guilt of a defendant beyond a reasonable doubt. We believe, however, that it is obvious from a review of the trial justice's entire charge that the jury was admonished on many occasions that the state had the burden of proving each and every element of the crime beyond a reasonable doubt.

For example, one such admonition came when the trial justice instructed the jury on the consideration of evidence and the weight to be given such evidence. The jury was also told that "the burden is upon the state and it never ever, ever, ever shifts to the defendant." Again the jury was reminded that "the burden is upon the state to prove each and every element beyond a reasonable doubt." The justice then proceeded to define reasonable doubt at great length. In addition, when the trial justice instructed the jury regarding the essential elements of murder, he again stressed that the state must prove the elements beyond a reasonable doubt. Finally the trial justice explained to the jurors, "If you find from all the evidence and the reasonable inferences to be drawn from the evidence that the state has proven each and every element of the crime, murder in the first degree, beyond a reasonable doubt and that this defendant did, in fact, commit those acts, you must bring back a verdict of guilty."

In *Parker v. Parker*, 103 R.I. 435, 442, 238 A.2d 57, 60–61 (1968), this court emphasized:

"The phrase 'clear and convincing evidence' is more than a mere exercise in semantics. It is a degree of proof different from a satisfaction by a 'preponderance of the evidence' which is the recognized burden in civil actions and from proof 'beyond a reasonable doubt' which is the required burden in criminal suits. If we could erect a graduated scale which measured the comparative degrees of proof, the 'preponderance' burden would be at the lowest extreme of our scale; 'beyond a reasonable doubt' would be situated at the highest point; and somewhere in between the two extremes would be 'clear and convincing evidence.' "

Here, however, it is obvious that the trial justice's passing reference to clear and convincing evidence was a reference to the quality of the evidence and not to the burden of proof. An examination of the trial justice's charge clearly indicates that on several occasions he reminded the jury that the state had the burden of proving Bertram's guilt beyond a reasonable doubt.

The defendant's appeal is denied and dismissed, and the judgment appealed from is affirmed.