STATE

v.

Sean E. MILETTE.

No. 98–142–C.A.

Supreme Court of Rhode Island.

April 13, 1999.

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Arthur E. Chatfield, III, Thomas G. Briody, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

Last term, in *State v. Milette*, 702 A.2d 1165 (R.I.1997), we vacated the decision of the trial justice that the defendant, Sean E. Milette (Milette), lacked standing to challenge the search of an automobile in which he had been driving at the time of a lawful traffic stop. On remand, we directed the trial justice to conduct a suppression hearing in order to determine the admissibility of a handgun found as a result of this search. After an evidentiary hearing, the trial justice determined that the search of the automobile was lawfully conducted and Milette's conviction for unlawful possession of a pistol was allowed to stand. Milette now seeks appellate review of that determination.

Following a prebriefing conference, both parties were directed to appear and show cause why this appeal should not be summarily decided. After hearing the arguments of the parties and reviewing their memoranda, we are satisfied that cause has not been shown. Accordingly, we shall decide the merits of this appeal at this time.

A brief recitation of the facts, as articulated in *Milette*, is necessary. On August 2, 1995, Milette was operating a black Ford Tempo in the southbound lane of Route 295 in Cranston. As Milette proceeded southbound, Trooper James Manni (Manni) of the Rhode Island State Police observed the Ford Tempo traveling at a speed far in excess of the fifty-five mile-per-hour posted speed limit. Manni immediately left his stationary radar post and followed the Ford Tempo a short distance before stopping the vehicle. Manni would later testify that upon activating his emergency lights, he observed Milette and his passenger engage in furtive movements. In particular, Manni "characterized these movements as 'dipping forward,' 'bending down,' 'leaning forward in almost a jerk-

ing motion,' and 'leaning forward and back up, leaning forward and back up.'" *Milette,* 702 A.2d at 1165.

In addition to these pre-stop observations, Manni testified that after stopping his cruiser behind the Ford Tempo, but prior to approaching the vehicle, he observed what appeared to be a quick exchange of words between Milette and his passenger, as well as additional movement between the vehicle's occupants. According to Manni, as he approached the vehicle, "[Milette] immediately put his arm fully extended out the window with what appeared to be his license." Alerted by this unusual gesture, which Manni interpreted as an attempt to keep him from looking inside the Ford Tempo, Manni approached the vehicle from the passenger's side. He thereupon observed both occupants leaning forward and looking out the operator's side window. Subsequently, upon request, Milette produced a valid driver's license, registration, and proof of insurance.

After obtaining identification from Milette and his passenger, Manni returned to his cruiser and called for backup. Upon the arrival of the additional police personnel, Manni ordered the occupants out of the vehicle and directed them to stand near the other officers who had recently arrived at the scene. Manni then removed his Stetson, leaned inside the vehicle, and looked in the area where he had observed the occupants' furtive movements. According to the trial justice, "Manni did little more than bend down, cant his head slightly, and look under the driver's seat which [Milette] had left exposed." Thereafter, Manni observed a revolver barely "an inch away from the front edge of the seat" in the very area that Milette and his passenger were gesturing.

On remand, Manni testified that prior to joining the ranks of the Rhode Island State Police, he had served as a special agent in the United States Secret Service. Manni explained that as part of his training, he studied various gangs and hate groups, including white supremacist organizations. According to Manni's suppression testimony, skinhead organizations consist mostly of young white males with military backgrounds who exhibit certain trademarks to prove

their allegiance. Manni added that these trademarks generally include a variety of tattoos, such as a Nazi iron cross with the word "Skinhead" tattooed somewhere around the cross, "a Swastika tattooed on the body, also German writing, German soldiers, picture[s] of German soldiers, picture[s] of devils, and words— various hate-type words." Manni also stated that according to his training and experience the presence of "spider web tattoos on a persons [*sic*] arms indicate that not only is the person a Skinhead but in all likelihood he [has] committed a violent act within the Skinheads."

Manni's training was particularly relevant in this case because, as he testified during the suppression hearing, his suspicions regarding this situation were aroused not only by the occupants' unusual movements, but also by their appearances. Manni stated that one of the first things he observed about Milette was a very large tattoo of a German soldier on his back with German writing above it, which, according to Manni, translated into "Blood and [H]onor." The suppression evidence also revealed the presence of another tattoo on Milette's right shoulder, which consisted of an iron cross and the word "Skinhead," as well as a spider web tattoo on both arms indicating prior crimes of violence. Manni added that the passenger was also bare chested and wearing shorts, which revealed the presence of numerous tattoos consistent with an allegiance to a skinhead organization. Finally, Manni testified that in his training and experience skinheads are usually armed. Indeed, as Manni stated, "if you can determine he is a Skinhead, [the probability is very high that] he is armed."

At the conclusion of the suppression hearing, the trial justice found that the revolver was discovered in plain view without any intrusive searching on the part of Trooper Manni. He declared that "[n]o Fourth Amendment rights of the defendant were impacted" because "[m]ere observation, after all, does not constitute a search." Alternatively, the trial justice determined that even if Manni's actions were to be characterized as a search of the vehicle, "it was nonetheless permissible as a precautionary, protective

measure for officer safety." We agree with this later conclusion.

■ The decision of a trial justice upholding a warrantless search of an automobile based upon an articulable suspicion is a mixed question of law and fact, which obviously impacts upon a defendant's constitutional rights. Hence, this Court conducts a *de novo* review of the record to determine the existence or nonexistence of either probable cause to believe that a crime has been committed or a reasonable suspicion that a suspect may be armed and dangerous. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996); *State v. Rios,* 702 A.2d 889, 889–90 (R.I.1997); *State v. Campbell,* 691 A.2d 564, 569 (R.I.1997).

Milette challenges the trial justice's finding that Manni merely conducted a limited protective search of the automobile and argues that this search involved a more serious intrusion upon his privacy than previously sanctioned by this Court in *State v. Aubin,* 622 A.2d 444 (R.I.1993), wherein the officer discovered a handgun by leaning into the vehicle with a flashlight while the driver searched the glove compartment. Moreover, Milette suggests that in formulating the articulable suspicion that he may have been armed, Manni considered improper factors, such as his physical appearance, which seemed to suggest an allegiance to a Neo–Nazi group, and his possession of white supremacist literature. As a result of these supposed improper considerations, Milette argues that his rights as protected by the First Amendment were impermissibly impacted and therefore rendered the search unlawful.[1]

■ This Court has long recognized that a police officer may order the driver of a lawfully stopped motor vehicle to exit the vehicle for the purposes of verifying identification and to further the strong public inter-est in securing the safety of law enforcement officers. *Aubin,* 622 A.2d at 445. *See also Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (passengers); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (drivers). Additionally, consistent with the Fourth Amendment, an officer may conduct a limited search of the automobile for weapons where the officer has an articulable suspicion to believe that the suspect may be armed and dangerous. *Michigan v. Long,* 463 U.S. 1032, 1051, 103 S.Ct. 3469, 3482, 77 L.Ed.2d 1201, 1221 (1983). As we have stated previously "the very great risk police officers encounter during routine traffic stops," coupled with "society's great interest in ensuring the safety of [the] police during such procedures," clearly justifies a search of the passenger compartment, albeit limited to those areas where a weapon may be hidden. *State v. Tavarez,* 572 A.2d 276, 278 (R.I.1990). *See also Long,* 463 U.S. at 1048, 103 S.Ct. at 3480, 77 L.Ed.2d at 1219.

■ Milette attempts to distinguish the search of this vehicle from the search allowed in *Aubin* by noting that since he and his passenger already had been ordered out of the vehicle prior to Manni's search, the "inherently dangerous situation" confronting the officer in *Aubin,* was missing in this case. *Aubin,* 622 A.2d at 446. Moreover, Milette insists that the instant search was illegal because its scope exceeded the mere inconvenience that we permitted in *Aubin.* We deem these arguments, however, to be without merit since the fact that the occupants have exited the vehicle and are subject to the control of the responding police officers does not negate the exigency to search the vehicle for weapons. *See Long,* 463 U.S. at 1051, 103 S.Ct. at 3482, 77 L.Ed.2d at 1221 (suspect may "break away from police control and retrieve a weapon from his automobile").

---

1. The Rhode Island affiliate of the American Civil Liberties Union (ACLU) also has submitted a prebriefing statement as amicus curiae and urges this Court initially to determine whether the automobile search was justified without considering Milette's political views and/or associations. If we are unable to uphold the search without considering these factors, however, the ACLU suggests that we determine whether a law enforcement officer may, consistent with the First Amendment, utilize such factors as a suspect's appearance, probable allegiance to a violent political philosophy, and any political tattoos in formulating an "articulable suspicion" that the suspect may be armed and dangerous.

■ Consequently, the question of whether a protective search for weapons is permissible does not depend on the location of the vehicle's occupants or their relative freedom of movement, but rather, whether the officer possesses a reasonable belief based upon " 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous" and may have the present ability to obtain a weapon. *Id.* at 1049, 103 S.Ct. at 3481, 77 L.Ed.2d at 1220. Therefore, our analysis rests upon the singular issue of whether, based upon the totality of the circumstances, a reasonably prudent officer in similar circumstances would be warranted in concluding that a suspect may be armed and pose a threat to his or her safety. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ The evidence adduced at trial and as augmented by Manni's testimony at the suppression hearing clearly demonstrated that Manni was confronted with two individuals who were engaged in furtive and suspicious behavior prior to and immediately following a lawful traffic stop. Both individuals were observed gesturing toward the floor and furthermore Milette, in an obvious attempt to prevent Manni from looking inside the vehicle, opened the driver's window and handed out his license, registration, and proof of insurance before Manni had even requested it. This unusual conduct amply justified Manni's suspicion about these individuals. Moreover, upon observing their appearances, Manni, mindful of his experience and training pertaining to white supremacist groups, immediately concluded that there was a high probability that these individuals were armed. We are satisfied that the officer, having been confronted with these particular facts and observations, was justified in deciding to conduct a limited search of the vehicle in the precise area where the occupants had concentrated their previous attention. This limited search was a minimal intrusion upon Milette's privacy and did not violate his rights as guaranteed by the Fourth Amendment.

■ In addition to challenging the validity of the search on Fourth Amendment grounds, Milette also injects First Amendment principles into the analysis, arguing that Manni considered his political association and appearance in formulating an articulable suspicion that he may be armed and dangerous. Reduced to its essence, both Milette and the ACLU suggest that a search motivated by an officer's awareness of a suspect's political beliefs, as well as an expression of those beliefs, is unlawful and therefore, the fruit of the poisonous search should be suppressed. We reject this novel exposition on the breadth of the First Amendment and conclude that Milette's First Amendment rights, including his rights to freedom of expression and association, were not compromised merely because an experienced police officer utilized known law enforcement criteria to formulate an articulable suspicion. Police officers in the field are simply not required to weigh free speech or political correctness considerations in reaching either probable cause conclusions or in formulating an articulable suspicion that a suspect may be armed and dangerous. The suggestion that the search of the vehicle was motivated by Milette's political beliefs or an expression of his ideas is simply without merit.

■ The validity of any search must be tested by an examination of all the facts and circumstances available to the officer at the time of the search. "The analysis proceeds with various objective observations, [including] information from police reports * * * and consideration of the modes or patterns of operation of certain kinds of lawbreakers." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981). It has been long recognized that a trained officer may draw inferences and deductions from this information, "inferences and deductions that might well elude an untrained person." *Id. See generally Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1983) (permitting the detainment of an individual whose appearance and conduct matched a drug courier profile).

In evaluating the conduct of an officer who is often confronted with split second deci-

sions, trial justices are cognizant that this process

> "does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629.

 Lastly, there must be a finding that the factors considered by a police officer reasonably give rise to "a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id.* This approach involves an examination of the specific information available to the officer at the time he or she decides to act and falls squarely within the jurisprudence of the Fourth Amendment, without implicating any First Amendment considerations. It is well settled that a criminal investigation is neither forbidden nor must it be curtailed when it interferes with a suspect's First Amendment freedoms. *See United States v. Rubio,* 727 F.2d 786, 791 (9th Cir.1983). "When activity protected by the First Amendment becomes the subject of a criminal investigation, the protections afforded by the Fourth Amendment come into play" and have been deemed to provide the necessary safeguards as mandated by the First Amendment. *Id.* A complete rendition of the facts and circumstances attendant to the decision to conduct a search for weapons, when properly scrutinized by the trial justice

and subject to *de novo* appellate review, sufficiently safeguards First Amendment principles. *See Zurcher v. Stanford Daily,* 436 U.S. 547, 565, 98 S.Ct. 1970, 1981, 56 L.Ed.2d 525, 541 (1978) (warrant requirement is merely required to be applied with "particular exactitude" when First Amendment interests may be endangered by a search).

This is not to say that evidence of an individual's association in a radical or subversive organization standing alone can justify a search and supply the requisite probable cause to obtain a search warrant. *See Rubio,* 727 F.2d at 794. However, an officer's actual knowledge of an organization's political goals and *modus operandi,* including its penchant for illegal weapons, is a valid factor that an officer may consider, along with other articulable facts, in concluding that criminal activity may be afoot. In conclusion, we are satisfied that no First Amendment rights are compromised by the utilization of known facts about a terrorist or subversive organization, along with other objective criteria available to an experienced police officer in the field.

For these reasons, the defendant's appeal is denied and dismissed. The judgment appealed from is affirmed and the papers in this case are remanded to the Superior Court.