**STATE**

v.

**Steven QUINLAN.**

**State**

v.

**Frank Sanchez–Collins.**

**Nos. 2004–36–C.A., 2004–37–C.A.**

Supreme Court of Rhode Island.

May 1, 2007.

## OPINION

Justice GOLDBERG, for the Court.

We undertake this case noting that:

"[I]n March of 2001, these two criminals committed two of the most brutal murders that this Court has heard recounted in many years. From the photographs and the crime scene videotape that was presented, it was apparent that these two defendants virtually painted the walls and floors of that apartment with blood. The victims were brutalized with a hammer, with vicious combat knives, even while one of them begged for his life.

"It wasn't enough that these two defendants brutalized and tortured their victims but afterwards, in an obvious and in a savage effort to destroy any trace evidence that might be found, they mutilated and severed the hands of the victims, hid them in a dumpster and then went on a morning escapade the next day in an effort to dispose of them.

"In so doing, they conscripted two friends who knew nothing about what had happened, and they bragged to them about what they had done and even chastised them for not being there to help them. Simply put, the depth of the depravity of these two murderers knew no bounds." [1]

These cases came before the Supreme Court on December 4, 2006, on separate appeals by the defendants, Steven Quinlan (Quinlan) and Frank Sanchez–Collins (Collins) (collectively defendants), that were consolidated for oral argument. The defendants appeal from Superior Court judgments of conviction for two counts of murder and two counts of conspiracy to murder Michael Batista (Batista) and Rafael Edwards Ortega (Ortega).

Paula Lynch, for Plaintiff Quinlan. Christopher S. Gontarz, Middletown, for Plaintiff Sanchez–Collins.

Jane M. McSoley, Providence, for Defendant (Quinlan case). Diane Daigle, for Defendant (Sanchez–Collins case).

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

1. The trial justice at sentencing, May 28, 2003.

Before this Court, defendants raise similar constitutional challenges to the stop and subsequent search of a motor vehicle in Massachusetts, which challenges were rejected after a joint suppression hearing in Superior Court. The defendants contend that the trial justice erred when he refused to suppress the evidence obtained in connection with the vehicle stop. They also assign error to the trial justice's finding that they lacked standing to challenge the search, and they contest the scope of the protective search for weapons, arguing that the search exceeded permissible bounds.

In addition to their similar constitutional arguments, defendants also have asserted additional trial errors: Collins argues that the automobile stop was motivated by race and Quinlan alleges that the trial justice erred when he refused to pass the case based on alleged juror misconduct. Quinlan also submits that the imposition of a sentence of life imprisonment without the possibility of parole was unwarranted in this case. He asks this Court to reduce his sentence to life imprisonment.

Because the motions to suppress were decided after a joint evidentiary hearing and both defendants raise the same Fourth Amendment challenges, we shall address these issues together; then, we shall separately decide the remaining issues raised by each defendant. For the reasons stated in this opinion, the judgments are affirmed.

### Facts and Travel

On a Sunday afternoon in March 2001, in connection with a routine traffic stop, members of the Somerset, Massachusetts, Police Department discovered a bloody bag containing two pairs of human hands on the floor of a vehicle in which Quinlan and Collins were passengers. Thus began an investigation into the brutal murders of two men with hammers and combat knives—a virtual massacre that spanned several hours—and culminated in the postmortem butchery of the victims' hands, in a futile attempt to avoid detection. The defendants were caught red-handed while attempting to dispose of the gruesome evidence.

A grand jury returned a four-count indictment against defendants, charging in counts 1 and 2, the murder of Batista and Ortega and in counts 3 and 4, a conspiracy to murder them. In September 2002, after the suppression hearing commenced in Superior Court, Collins's trial counsel became ill. As a result, defendants were tried separately; however, Collins agreed to incorporate the testimony and decision from Quinlan's pretrial suppression hearing into his case.

After trial in Superior Court, verdicts of guilty were returned against Quinlan on October 1, 2002; the jury also found that the state had proven, beyond a reasonable doubt, that the murders were occasioned by aggravated battery and torture. Collins was also convicted of all counts by a Superior Court jury on February 21, 2003, and the jury in that case found aggravated battery and torture as well. Motions for a new trial initially were filed by each defendant but were withdrawn. In a consolidated sentencing proceeding, the trial justice imposed two concurrent sentences of life imprisonment without the possibility of parole for the crimes of first-degree murder and two ten-year sentences for the convictions of conspiracy to murder. The defendants filed timely notices of appeal.

The record discloses that Officer Todd Costa (Officer Costa), a patrolman with the Somerset, Massachusetts, Police Department, was on routine traffic patrol on the day of the incident, monitoring vehicular traffic in a parking lot near the town center. Officer Costa testified at the suppres-

sion hearing and at both trials that traffic was moving slowly when he noticed a beige Jeep Cherokee (Jeep) with a Rhode Island registration traveling south on County Street. As the Jeep slowed down, he noticed an obstruction in the windshield area that consisted of a sizeable cluster of materials hanging from the rearview mirror. Officer Costa described this obstruction as a "clump of things"—the clump comprised a flag that measured several square inches with an inch of fringe around it, a string of beads, and several cardboard air fresheners. This obstruction stretched from the rearview mirror to the dashboard. Officer Costa determined that this display violated Mass. Gen. Laws Ann. ch. 90, § 13 (West 2001), which prohibits any item to be on or in a motor vehicle that may interfere with or impede the driver's safe operation.

As the Jeep passed Officer Costa's location, he saw four occupants—a white male and three men who were either African-American or Hispanic. These men were "staring intently" at him. Officer Costa pulled into the slowly moving traffic heading south, intending to stop the Jeep for the motor vehicle violation. At this point, the occupants began fidgeting, leaning forward and turning around in their seats and looking back at him. Officer Costa radioed dispatch for information on the vehicle's registration and, based on what he characterized as the occupants' suspicious behavior, he requested backup. Officer Costa testified that just before he activated his cruiser's lights, the Jeep made an abrupt left turn into a Dunkin' Donuts and Cumberland Farms parking lot and came to a sudden stop between two parking spaces. Officer Costa activated his emergency lights and stopped his vehicle behind the Jeep.

As he waited for backup, he watched the front passenger, later identified as Collins, bending forward in his seat toward the floor. Shortly thereafter, Sergeant Brian Leonard (Sergeant Leonard) arrived, and both officers approached the vehicle; Officer Costa went to the driver's window, and Sergeant Leonard moved to the passenger side. Officer Costa asked the driver, later identified as Osiris Parra (Parra), for his license and registration. In a barely audible response, Parra said that he had neither a license nor registration with him.

Officer Costa testified that Parra was "very apprehensive," refused to make eye contact with him, and because of Parra's mumbled responses, Officer Costa asked him to repeat his Social Security and driver's license numbers several times. Officer Costa noticed that none of the passengers was wearing a seat belt, a violation of Massachusetts law. He requested their names, dates of birth, and Social Security numbers so that he could issue them citations. Meanwhile, Officer Tracy Kerrigan (Officer Kerrigan) arrived and stood behind the Jeep's rear driver's side door and watched the occupants. After Officer Costa was informed that there was no record of the license number that Parra had given him, he returned to the Jeep. Parra, who still appeared nervous, gave the officer a different number that corresponded to an active Rhode Island driver's license issued to Osiris Parra. According to Officer Costa, at this point, it was his intention to issue citations to the four men and send them on their way.

While he was filling out the citations, Officer Costa was notified of an outstanding arrest warrant for defendant Quinlan in connection with a traffic offense in Massachusetts. Quinlan, who was sitting in the rear seat behind the passenger, was taken into custody. He was handcuffed, frisked, and placed in Officer Costa's cruiser.

Meanwhile, Officer Kerrigan was watching the other occupants, who continued to

move around in their seats and ignored her directions to keep their hands where she could see them. The front passenger, defendant Collins, continuously reached toward the floor of the Jeep, an area that she could not see. The three men attempted to engage Officer Kerrigan in conversation about Parra's new baby and a computer business that Collins was starting, and even offered her a job. Officer Kerrigan testified that she considered this conduct both highly unusual and an attempt to distract her from what was going on in the vehicle.

Officer Kerrigan informed the other officers that the men in the Jeep had disregarded her orders and failed to keep their hands in sight; she added that she had seen a black mask and dark clothing in the back of the vehicle. At this point, the officers decided to pat-down the occupants and conduct a protective sweep of the vehicle for weapons. Parra, Collins, and the rear passenger, Marcos Quinones (Quinones), were asked to step out of the vehicle; they were checked for weapons and asked to stand with Sergeant Leonard at his cruiser.

Officer Costa began a protective sweep of the Jeep for weapons and concentrated on the floor of the front seat, the area where Collins had been sitting and engaging in furtive behavior. He found a gray shirt with the sleeves tied in a bundle. He picked it up to move it aside and observed that the bundle was heavy, wet, and hard. According to Officer Costa, believing that

a weapon could be concealed inside the wet shirt, he donned gloves, placed the shirt on the front seat, and untied the sleeves. Officer Costa discovered a white plastic grocery bag covered in blood; he opened the bag and saw a human hand and a rock. Several things happened at once: Officer Costa began shouting about the blood; Officer Kerrigan looked over and saw the bloody bag; Parra fainted and fell to the ground; and Sergeant Leonard yelled to the other officers to secure the suspects. The officers immediately handcuffed Collins and Quinones, and an ambulance was called for Parra. All four men then were transported in separate cruisers to the police station, and the vehicle was impounded.[2]

While in custody in Massachusetts, Parra and Quinones denied any involvement with the dismembered hands or the crimes from which the body parts emanated. Both men cooperated with the police and testified at both trials.[3] Parra testified at the suppression hearing and the trials that he and Quinlan (known as "Fury") and Collins (often called "Gomer") were friends. According to Parra, both defendants carried matching combat knives with spiked brass knuckle handles, which they often showed off to others. Parra testified that Quinlan and Collins regularly hung out with the victims, Batista and Ortega, but that in the days before the murders Quinlan had become upset about a used car that Batista had sold him. Apparently, the dissatisfaction about this transaction may have led to these brutal killings.

**2.** When the officers discovered the human hands, the search for weapons was halted and the vehicle was impounded. A subsequent search of the vehicle pursuant to a warrant revealed two knives, including a machete.

**3.** Parra pled guilty in Massachusetts to four counts of being an accessory after the fact to murder, for which he received five years probation. The State of Rhode Island agreed not

to prosecute him in exchange for his assisting the police and testifying at both trials. Quinones initially was charged in Massachusetts with being an accessory after the fact to murder, and he served a month in jail, but those charges were later dismissed. He was not prosecuted in Rhode Island or Massachusetts, and his testimony was not the product of any agreement with authorities.

Quinones also testified at both trials. At Quinlan's trial, Quinones recounted that when the battery in the used car died, Quinlan was forced to walk home from work. According to Quinones, Quinlan was so upset that he was planning to kill Batista, asking Quinones if he "was down for it." However, Quinones testified that he did not take Quinlan's threat seriously. At Collins's trial, Quinones testified that Collins wanted to kill Batista, because Quinlan owed Collins and Batista $300, and if Batista was dead, there was a greater likelihood that Quinlan would pay him. Thus, because of a dead battery and a $300 debt, two young lives were taken.

According to Parra, he first learned about the murders when Quinlan and Collins arrived at his home on Sunday morning and invited him out, ostensibly to smoke marijuana. As the trio drove off in a Jeep owned by Parra's mother, Collins announced, "we got those niggers" and that he felt like killing Parra because he had not been there. Parra testified that at that point he became fearful. Collins told him to drive to Quinones's house.

After Quinones joined the group, the next stop was a dumpster on Chestnut Street in Providence, where Collins retrieved a plastic grocery bag dripping with blood. A smiling Collins opened the bag and showed Parra four human hands. Quinones, who was in tears at that point, refused to look in the bag and asked to go home; but Collins refused because they needed to get rid of the hands. Collins wrapped the bag in a shirt and they proceeded to India Point Park where he placed a rock in the bag to weigh it down. However, his plan to toss the bundle into

the water was foiled by the number of people in the park. The four men and the grisly remains then set out for Fall River, Massachusetts, and the Braga Bridge.

According to Parra, during the ride to Fall River, Collins recounted how he and Quinlan were at Batista's apartment at 57 Academy Avenue the previous evening with Ortega and Batista, drinking, taking Ecstasy, and smoking blunts.[4] In accordance with a premeditated plan, Quinlan stabbed Ortega in the neck and Collins hit him in the head with a claw hammer. Collins then attempted to put Ortega's body in the bathtub, but it was too heavy. After killing Ortega, they laid in wait for Batista. Collins bragged that, before Batista was killed, he begged for his life, and Collins cut off his ear. Quinlan and Collins cleaned the blood-soaked apartment for several hours and disposed of their weapons and bloody clothes in a dumpster on Cranston Street. The victims' hands were crudely dismembered with butcher knives.

The plan to dispose of the hands at the Braga Bridge[5] was thwarted by heavy traffic on the bridge and a high safety fence at the sides. Parra was directed to drive until they found an exit near a business district so they could look for a large dumpster. Although Parra worried that they were low on gas, Collins insisted that they dispose of the bag of hands. Parra was looking for a gas station when he saw Officer Costa enter the lane of traffic behind the Jeep. Collins told everyone to remain silent, but added that, if they were caught, they should tell the police that some Dominican guys from New York had paid them to get rid of the hands and had

4. A blunt is a hollowed out cigar filled with marijuana.

5. For the reader unfamiliar with the geography of Southeastern New England, the Braga Bridge is a large bridge that spans the Taunton River and connects the Massachusetts municipalities of Somerset and Fall River.

threatened to kill them if they did not do so.

The Providence Police were notified about the hands and were informed that the bag was thought to be connected to a double homicide in Providence. The disclosures made by Parra and Quinones eventually led the Providence Police to 57 Academy Avenue. The detectives entered the building through the bloodstained rear door; the door to the apartment was open and was also covered with blood. The smell of natural gas was apparent, and the fire department was summoned to secure the building. The detectives returned to the apartment and found Rafael Edwards Ortega's body draped over the bathtub. A trail of blood led to the body of Michael Batista, who also had been brutally beaten and stabbed. The hands had been severed from both bodies. Additional evidence was found in several locations in Providence.[6]

The autopsies were performed simultaneously by Chief Medical Examiner Elizabeth Laposata (Dr. Laposata), who conducted the autopsy on Batista, and Deputy Chief Medical Examiner Michael Sikirica (Dr. Sikirica), who performed the autopsy on Ortega.

Doctor Laposata testified that Batista died from multiple traumas. She counted at least seventeen head wounds, but testified that because the injuries had confluenced, or combined, there were many more, making it impossible to determine which wounds were fatal. Numerous skull fractures were caused by blunt force trauma, and two fractures were so severe that Batista's brain was torn in two places, and the left side of his scalp was "nearly pulverized." Doctor Laposata testified that the injuries would have caused disorientation and eventually, but not immediately, loss of consciousness. She counted thirty-one puncture wounds to Batista's face, twenty to his scalp, and at least twenty-four wounds to his torso and abdomen. Batista's lung, liver, and spleen were punctured—injuries that were consistent with stabbing by combat knives and blows from a claw hammer. Batista suffered internal hemorrhaging in his genitals resulting from a blow to the groin area. Doctor Laposata concluded that Batista's ear was amputated while he was still alive but that his hands likely were severed after his death.

Doctor Sikirica testified that Ortega died from multiple traumatic injuries to the head, face and torso. He suffered so many blows and fractures to the head that his left eye ruptured from the blows. Several teeth were found in his stomach, along with almost a pint of blood, signifying that he swallowed the teeth before he died. Doctor Sikirica concluded that the puncture wounds on Ortega's body were consistent with the combat knives found in the dumpster. He testified that the head injuries did not result in immediate death and that most of the wounds were inflicted before death.

Angelo Isom (Isom), who is Collins's cousin, also testified at both trials. Isom,

---

**6.** A knife was found lying on the counter in the apartment at 57 Academy Avenue, along with a bent and broken bloody knife blade. The police seized a bloodstained Lincoln automobile from a parking lot on Prairie Avenue; later investigation revealed Quinlan's fingerprints on a rear window. Providence detectives also searched a dumpster on Cranston Street and found evidence directly linking Quinlan and Collins to the murders; that evidence included two spiked combat knives that matched Parra's description, a plastic bag filled with bloodstained clothing, and a pillowcase containing a glove, brown construction boots, and another knife handle. Two witnesses identified this clothing as belonging to Quinlan and Collins, and DNA testing confirmed that the bloodstains matched Ortega's and Batista's DNA.

who initially denied knowing anything about these murders, retained counsel and signed a cooperation agreement with the state when he learned defendants were pointing their fingers at him. We briefly recount his testimony about what he witnessed.

Isom testified that he was in the apartment when Ortega was killed but was passed out in the living room. When he woke up, he saw Quinlan standing over Ortega, hitting him in the head with a hammer. The floors and walls of the apartment were covered in blood, as was Quinlan. Collins told Isom that he and Quinlan had stabbed Ortega and that they were waiting for Batista. After an argument with his cousin, Isom left the apartment. He looked for Collins the next day and was told that he had been arrested.

Both defendants testified at their respective trials. Quinlan acknowledged that he and the victims were friends, but he denied killing them. Although he admitted that he and Batista had argued about the used car, he said that he did not threaten to kill him. He denied any discussion with Quinones or Collins about killing Ortega or Batista.

According to Quinlan's version of events, which the trial justice later described as "some of the most ludicrous lies ever told," the five men were together on the night of the murders at Batista's Academy Avenue apartment, where they were drinking, smoking marijuana, taking Ecstasy, and "free-style rapping." [7] When Ortega began insulting Isom, Isom attacked him with a knife and everyone began wrestling. Quinlan testified that he tried to rescue Ortega, but Isom first hit Ortega, and then assaulted Batista with a hammer. Quinlan admitted that he helped with the cleanup, but that it was Isom who cut off Batista's hands, explaining that Batista may have scratched him during the assault. Quinlan and Collins agreed with this reasoning and proceeded to remove Ortega's hands with a kitchen knife.

Collins testified in his case and admitted that he was present that night and was involved in the cover-up, but denied killing anyone. He said that he heard a big bang and went into the living room and saw Quinlan and Isom, who were covered in blood, standing near Ortega. Collins alleged that he tried to convince Batista to flee the apartment but Batista began punching Quinlan, at which point Isom stabbed him. According to Collins, he spent twenty minutes in the bathroom until Quinlan came in and told him that they were going to cut off the victims' hands. Collins acknowledged cutting off Ortega's hands and cleaning the apartment. He had no explanation for why his combat knife was left in the dumpster.

Additional facts will be provided as necessary to address the issues that defendants raised.

### Issues

 The defendants contend that the trial justice erred in denying their motions to suppress evidence obtained as a result of the stop and subsequent search of the vehicle. In reviewing a ruling on a motion to suppress, this Court gives deference to a trial justice's factual findings, and those historical "findings shall not be disturbed unless they are clearly erroneous." *State v. Verrecchia*, 766 A.2d 377, 382 (R.I.2001) (quoting *State v. Briggs*, 756 A.2d 731, 741 (R.I.2000)); *see also State v. Lombardi*, 727 A.2d 670, 673 (R.I.1999) ("The credibil-

---

7. According to the state's brief, free-style rapping "consists of spontaneously composing musical rhymes made up of sixteen bars."

ity findings of a trial justice on a motion to suppress will not be disturbed unless clearly erroneous."). However, in determining whether a defendant's constitutional rights have been violated, this Court undertakes *de novo* review. *State v. Casas,* 900 A.2d 1120, 1129 (R.I.2006).

The trial justice held and both parties agree that the lawfulness of the stop is governed by Massachusetts law, but the subsequent search and motion to suppress will be analyzed under Rhode Island law. We agree. *See Briggs,* 756 A.2d at 739–40 (applying an interest-weighing approach and determining that Rhode Island law applied to "constitutional validity of the police seizure" that occurred in a different state).

The trial justice determined that the initial stop was lawful and that defendants lacked the requisite standing to challenge the automobile search. Even though he found that the parties had no expectation of privacy in the Jeep, the trial justice went on to find that the search of the vehicle was lawful. Our review of the record in this case leads us to the same conclusion—the vehicle was lawfully stopped, and defendants have no standing to challenge the subsequent search.

### The Vehicle Stop

■■■ It is well established that a traffic stop, regardless of how brief and limited, constitutes a seizure for Fourth Amendment purposes, and thus must be reasonable under the circumstances. *Whren v. United States,* 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Casas,* 900 A.2d at 1133. A stop is reasonable if the officer has "probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810, 116 S.Ct. 1769; *see also State v. Bjerke,* 697 A.2d 1069, 1072 (R.I.1997) (quoting *Whren*). The question of whether a stop is reasonable is "almost always fact specific." *United States v. Owens,* 167 F.3d 739, 748 (1st Cir.1999); *see also Casas,* 900 A.2d at 1133 (quoting *Owens*). We accord deference to the trial justice's findings of historical fact, but we will overturn his or her findings if a defendant's constitutional rights were violated, or if there were material facts that were overlooked or misconstrued. *Casas,* 900 A.2d at 1129; *State v. Foster,* 842 A.2d 1047, 1050 (R.I.2004). Because defendants' constitutional rights are affected, we perform *de novo* review of questions of law. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *see also Casas,* 900 A.2d at 1129.

Based upon our *de novo* review of the record in this case, we are of the opinion that Officer Costa was legally justified in stopping the vehicle, under Mass. Gen. Laws Ann. ch. 90, § 13.[8] Parked at a fixed location and from a distance, Officer Costa saw the flag and other obstructions hanging from the Jeep's rearview mirror. The photographs introduced into evidence in this case depict a large obstruction, in the appearance of a Dominican flag and other items, hanging from the Jeep's rearview mirror. After hearing testimony and viewing these photographs, the trial justice determined that "[u]nquestionably, in this Court's view, it would interfere with a clear view through the front windshield" and that "under the applicable Massachu-

---

8. Massachusetts General Laws Annotated ch. 90, § 13 (West 2001) states in pertinent part:
 "No person, when operating a motor vehicle, shall permit to be on or in the vehicle or on or about his person anything which may interfere with or impede the proper operation of the vehicle or any equipment by which the vehicle is operated or controlled * * *."

setts statute [Officer Costa] had a lawful right to stop the vehicle."

After reviewing the record in this case, including the photographic evidence, we are of the opinion that the vehicle stop was legitimate, that it was warranted by the prohibitions of the statute, and was objectively verifiable. We deem the officer's conclusion that the flag, beads, and cardboard air fresheners impeded the proper operation of the vehicle, in violation of Mass. Gen. Laws Ann. ch. 90, § 13, to be both reasonable and supported by the evidence. The record in this case unequivocally demonstrates that a significant portion of the Jeep's windshield was blocked by these items and that these obstructions are of the type that fall within the statute's prohibitions.

■ Quinlan directs our attention to a different statutory provision, Mass. Gen. Laws Ann. ch. 90, § 9D (West 2001),[9] which regulates the use of decals and tinted windows and contains an exception for out-of-state vehicles, and he argues that this is the applicable statute. Alternatively, Quinlan contends that even if Mass. Gen. Laws Ann. ch. 90, § 13 applies to the facts in this case, there should be an im-

plied exception for out-of-state vehicles. We agree with the hearing justice that Mass. Gen. Laws Ann. ch. 90, § 9D has no relevance to the case at bar; it was not the provision that Officer Costa relied on when he stopped the Jeep.[10] Accordingly, we are satisfied that the stop was predicated on Mass. Gen. Laws Ann. ch. 90, § 13 and that this provision applies to out-of-state vehicles as well as to vehicles registered in the Commonwealth of Massachusetts.

Both Quinlan and Collins refer to *Commonwealth v. Brazeau*, 64 Mass.App.Ct. 65, 831 N.E.2d 372, 373 (2005), a recent opinion by our learned colleagues on the Massachusetts Court of Appeals.[11] In *Brazeau*, a motorist was stopped for having objects hanging from the rearview mirror in violation of Mass. Gen. Laws Ann. ch. 90, § 13; the obstruction consisted of two or three small items and a glass prism that measured approximately one square inch. *Brazeau*, 831 N.E.2d at 373–74. The trial justice in that case erroneously found that a reflection from the prism impeded the driver's vision and denied the motion to suppress. *Id.* at 373. The Court of Appeals reversed, holding that the stop was not based on a reflection from the prism, and without such evidence, the

---

9. Massachusetts General Laws Annotated ch. 90, § 9D (West 2001) states in pertinent part:

"No person shall operate any motor vehicle upon any public way or upon any way to which the public shall have the right of access with any of the following affixed thereto:

"(1) a sign, poster or sticker on the front windshield, * * *

"(2) nontransparent or sunscreen material, window application, reflective film or nonreflective film * * *

"This section shall not apply to:

"* * * *

"(6) a vehicle registered in another state, territory or another country or province."

10. Additionally, we pause to note that the exception for out-of-state vehicles as set forth in Mass. Gen. Laws Ann. ch. 90, § 9D, was

included by the Legislature with respect to the prohibition against decals and tinted windows, but that no similar exception is found in Mass. Gen. Laws Ann. ch. 90, § 13. We deem this intentional.

11. We note that the Massachusetts Supreme Judicial Court (SJC) has not addressed the applicability of Mass. Gen. Laws Ann. ch. 90, § 13 in recent years. There are several SJC decisions, dating back to 1928, which addressed violations of the statute. *See, e.g., Commonwealth v. Arone*, 265 Mass. 128, 163 N.E. 758, 759–60 (1928) (dust and dirt on windshield violated statute); *Seymour v. Dunville*, 265 Mass. 78, 164 N.E. 79, 80 (1928) (too many passengers in front seat violated statute); *Morse v. Sturgis*, 262 Mass. 312, 159 N.E. 622, 623 (1928) (dog sitting in front seat jumping onto driver's lap violated statute).

court concluded, it was not reasonable that items measuring one square inch that hung from the mirror, could impede a driver's view. *Id.* at 373–74. Under the facts in that case, the court held that a vehicle stop was not warranted. *Id.* at 375. We note that in *Brazeau,* the hanging items "were not unusually large" and that they were "dwarfed by comparison with the generous size of the * * * windshield." *Id.* at 374, 375. The *Brazeau* court held that "[h]ad the officer in fact testified to his reliance upon objectively verifiable qualities of the hanging items that made them distracting or that interfered with the driver's view, a different case may have been presented." *Id.* at 374. In the case at bar, Officer Costa and the trial justice encountered just such a case.

Here, the cluster of items hanging from the mirror included a flag that was several inches wide and long, with an inch of fringe on each side. This obstruction spanned from the rearview mirror to the dashboard and also included a thick strand of beads and several cardboard air fresheners. There was testimony from Officer Costa that the obstruction was visible from his traffic post. The photographs introduced establish objectively verifiable evidence that this cluster of material and objects impeded the driver's view and fall within the parameters of the statute. Accordingly, we uphold the constitutionality of the traffic stop in this case.

■■■■ The defendants also challenge the propriety of the officers' actions after the traffic stop. An automobile stop and subsequent investigation must be reasonable under the circumstances, including its purpose and duration. *Casas,* 900 A.2d at 1133. The question of reasonableness is fact specific, based on the totality of the circumstances. *Id.* It is well settled that an officer can order the driver and passengers to get out of a lawfully stopped vehi-

cle without violating the Fourth Amendment's prohibition against unreasonable searches and seizures. *See Pennsylvania v. Mimms,* 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (officer may order driver out of lawfully stopped vehicle); *see also Maryland v. Wilson,* 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (extending *Mimms* to passengers); *State v. Milette,* 727 A.2d 1236, 1239 (R.I.1999) (*Milette II*) (citing *Mimms* and *Wilson*). Additionally, "an officer may conduct a carefully limited search of the outer clothing [of a vehicle's occupant] in an attempt to discover weapons provided that the officer was able to point to 'specific and articulable facts' which warranted a person of reasonable caution in the belief that the action taken was appropriate." *State v. Collodo,* 661 A.2d 62, 65 (R.I.1995) (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

This Court has determined that pat-down searches were justified for the driver of a speeding vehicle who had no registration and made furtive gestures, *State v. Tavarez,* 572 A.2d 276, 278 (R.I.1990); as well as for the passenger of a speeding vehicle when the driver had no license or registration and the defendant was fidgeting and not making eye contact, *Collodo,* 661 A.2d at 66.

The vehicle's occupants in the present case were not handcuffed or placed under arrest; they were merely frisked for weapons and asked to stand next to Sergeant Leonard. We are satisfied that the officers had reasonable suspicion to conduct a pat-down frisk for weapons after they had observed furtive and suspicious behavior and after the occupants repeatedly ignored orders to keep their hands where Officer Kerrigan could see them. Because the parties also challenge the propriety and scope of the automobile search, we shall

next address the question of their standing to do so.

## Standing to Challenge Search

 "The Fourth Amendment [to the United States Constitution] protects people, not places." *State v. Milette,* 702 A.2d 1165, 1166 (R.I.1997) (*Milette I*) (citing *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "Fourth Amendment rights are personal rights[,]" and cannot be "asserted vicariously by a defendant merely because he or she may be aggrieved by the introduction of damaging evidence." *State v. Bertram,* 591 A.2d 14, 18 (R.I.1991); *see also Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *State v. Porter,* 437 A.2d 1368, 1371 (R.I.1981). The defendant bears the burden of establishing the requisite standing to challenge the legality of the search. *Bertram,* 591 A.2d at 18 (citing *Porter,* 437 A.2d at 1371). This Court undertakes *de novo* review. *Casas,* 900 A.2d at 1131.

 A party has standing when he or she is found to have a reasonable expectation of privacy in the area searched or the thing seized. *Casas,* 900 A.2d at 1129–31; *Verrecchia,* 766 A.2d at 382. In examining whether a reasonable expectation of privacy exists, "no single factor invariably will be determinative." *Casas,* 900 A.2d at 1129–30 (quoting *Rakas,* 439 U.S. at 152, 99 S.Ct. 421 (Powell, J. concurring)). Courts look to several factors, including "whether the suspect possessed or owned the area searched or the property seized; his or her prior use of the area searched or the property seized; the person's ability to control or exclude others' use of the property; and the person's legitimate presence in the area searched." *Id.* at 1130 (quoting *State v. Linde,* 876 A.2d 1115, 1127 (R.I.2005)). The determination of whether there is a reasonable expectation of priva-

cy, and thus standing, is a two-tiered analysis: (1) the defendant must have a "subjective expectation of privacy," *and* (2) the expectation must also be "one that society accepts as objectively reasonable." *Bertram,* 591 A.2d at 19 (citing *California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988)).

Each defendant alleges that the trial justice erred in finding that merely because he did not own the vehicle or was even a regular passenger, he lacked the requisite standing to challenge the search. The trial justice found that Quinlan's and Collins's sporadic use of the Jeep as passengers did not give rise to any legitimate expectation of privacy in the vehicle. This Court has been confronted with this issue on previous occasions in *Bertram,* 591 A.2d at 18 and *State v. Pena Lora,* 746 A.2d 113, 118–19 (R.I.2000). In *Bertram,* we concluded that the defendant had no legitimate expectation of privacy as a passenger in a car his wife leased in her own name, notwithstanding that he had used the car in the past with her permission. *Bertram,* 591 A.2d at 20–21. In *Pena Lora,* this Court held that a commercial occupant of a motor vehicle in need of repair had no reasonable expectation of privacy in the vehicle. *Pena Lora,* 746 A.2d at 118–19.

The defendants rely on our decision in *Milette I,* 702 A.2d at 1166–67, in which we held that a defendant had a reasonable expectation of privacy and thus standing to challenge the search of his father's car because he had his own set of keys, kept personal possessions in the car, and frequently used the vehicle with his father's permission. The facts in *Milette I* and the present case are miles apart—both Quinlan and Collins were passengers in Parra's mother's vehicle; neither had ever driven the Jeep and had never kept personal property in the vehicle. We agree with the trial justice that Quinlan and Collins

did not have a possessory or ownership interest in the vehicle or the evidence seized from it, and they certainly had no expectation of privacy that society would recognize as objectively reasonable. *Bertram*, 591 A.2d at 19.

Because we are satisfied that defendants lacked standing to contest the search, we need not address the propriety or scope of the protective search for weapons. Accordingly, we uphold the denial of the motion to suppress. We now turn to the separate issues each defendant raised.

### The Defendant Collins Selective Prosecution Based on Race

■■■■■ The defendant Collins argues that Officer Costa's reliance upon Mass. Gen. Laws Ann. ch. 90, § 13 as authority to stop the vehicle was pretextual and that the traffic stop was motivated by race and discriminatory intent and therefore violated his right to due process. In reviewing claims of selective prosecution, we follow the holding in *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). *See State v. Ricci*, 704 A.2d 210, 211 (R.I.1997) (adopting *Wayte* for review of claims of selective prosecution). To prevail on an allegation of selective prosecution, the defendant must prove two elements: (1) "that the challenged enforcement has both a discriminatory effect" and (2) that the prosecution was " 'deliberately based upon an unjustifiable standard such as race, religion, or some other arbitrary classification.' " *Ricci*, 704 A.2d at 211 (quoting *Wayte*, 470 U.S. at 608, 105 S.Ct. 1524).

The defendant's allegation of selective prosecution is without merit. There simply is no evidence tending to support the bald assertion that this stop was racially motivated. Collins argues that merely because Officer Costa noticed that some of the Jeep's occupants were "brown or black," his decision to stop the vehicle was motivated by race. As the trial justice noted, Officer Costa's behavior at the scene belies any indication that the stop was racially motivated: the occupants were not immediately ordered out of the Jeep, and they were not handcuffed until the body parts were discovered inside the bloody bag. There is no suggestion of racial animus or bias with respect to the stop or the search. Because Collins has not offered any proof about either element, his allegation of selective prosecution must fail.

### The Defendant Quinlan Mistrial Based on Juror Misconduct

■■■ The defendant Quinlan asserts that the trial justice's refusal to grant a mistrial and failure to admonish the jury based on juror misconduct was reversible error. We disagree. During the trial, it was disclosed that one of the jurors spoke about the case, visited the crime scene, and possibly read a news report about the murders. Based on this disclosure, Quinlan alleged that the jury was tainted to such a degree that a mistrial should have been granted. Upon questioning by the trial justice, it was discovered that one of the jurors had in fact spoken about the case in general terms; however, the record discloses that the other jurors ignored him. It also was alleged that the juror referred to the area around 57 Academy Avenue as a "working-class" or "low-class" neighborhood.

■■■■■ "It is well settled that a decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *State v. Suero*, 721 A.2d 426, 429 (R.I.1998); *State v. Figueroa*, 673 A.2d 1084, 1091 (R.I.1996). The trial justice "possesses a 'front-row seat' at the trial and can best determine the effect of [any potential prejudice] upon the jury."

*Figueroa,* 673 A.2d at 1091 (quoting *State v. Tempest,* 651 A.2d 1198, 1207 (R.I. 1995)). The refusal of the trial justice to pass a case is accorded great deference and will not be disturbed on appeal unless it is shown to be clearly wrong. *Figueroa,* 673 A.2d at 1091; *Tempest,* 651 A.2d at 1207. We reiterate that a rebuttable presumption of prejudice does not arise merely because extraneous information is placed before the jury. *State v. Hartley,* 656 A.2d 954, 961–62 (R.I.1995). In *Hartley* we declared that "the proper method of determining the prejudicial effect of extraneous information is to consider the probable effect that such information would have on an average reasonable juror." *Id.* at 962. Only when the trial justice finds that the incident "would probably influence the decision of an average reasonable juror," is the information prejudicial such that a mistrial should be granted. *Id.* After questioning the jurors, the trial justice found no evidence that the remarks made by the juror reflected guilt or innocence. Rather, the juror was characterized as a nuisance. Based on the record before us, we are satisfied that the behavior of a single juror who was dismissed from the panel could not have influenced the jury nor did it warrant a mistrial.

Quinlan relies on *State v. Carmody,* 471 A.2d 1363, 1366–67 (R.I.1984), in which a juror made representations about his belief as to the guilt of the defendants. In the present case, however, there is no evidence that the juror did anything other than comment, more or less to himself, about the trial and what had transpired that day. We are satisfied that *Carmody* is of no assistance to defendant. Additionally, unlike the facts in *Hartley,* 656 A.2d at 959–60, there was no unauthorized view by the juror in this case. In the case at bar, the juror who viewed the crime scene did so from the vantage point of his bus, while en route to his home. There is no evidence that the juror went to the area or otherwise drove past the location to view the crime scene.

The trial justice was satisfied that the comments the juror made were not prejudicial, and he excused him.[12] Further, defense counsel acquiesced to the cautionary charge the trial justice gave to the jury, thereby waiving any objection on appeal. *See State v. Snell,* 892 A.2d 108, 123 (R.I. 2006) (because defendant failed to object to jury instructions, his allegation of error was waived); *State v. Lynch,* 854 A.2d 1022, 1034 (R.I.2004) (citing well settled principle that " 'failure to object to a jury instruction precludes review of the instruction on appeal' "); *see also United States v. Cormier,* 468 F.3d 63, 74 (1st Cir.2006) ("The fact that [defendant] declined the court's offer of an additional instruction is also indicative of the lack of prejudice.").

### Life without the Possibility of Parole

■■■■ The defendant Quinlan has challenged the sentence imposed for these convictions. "Because this case involves the imposition of a sentence of life without the possibility of parole, it is incumbent upon this Court to exercise its own independent judgment and discretion in determining the appropriateness of the sentence." *State v. Tassone,* 749 A.2d 1112, 1119 (R.I.2000) (citing *State v. Travis,* 568 A.2d 316 (R.I.1990); *State v. Lassor,* 555 A.2d 339 (R.I.1989)). In our independent review of the appropriateness of a sentence of life imprisonment without the possibility of parole, we look to the record, the jury's findings, the trial justice's conclu-

---

12. The trial justice also allowed the defense to decide whether to excuse the female juror who expressed offense over the other juror describing her neighborhood as "low-class" or "working-class." That juror subsequently was excused.

sions, and the character and propensities of the defendant, including any aggravating circumstances as well as any mitigating factors. G.L.1956 § 12–19.2–4; *State v. Motyka*, 893 A.2d 267, 290 (R.I.2006). Our review is *de novo*. *See* § 12–19.2–5; *Motyka*, 893 A.2d at 287–88; *Tassone*, 749 A.2d at 1119.

Although mindful that we are undertaking *de novo* review of this sentence, in the circumstances before us, we need not look beneath the first layer of blood. Based on the degree of brutality evident in the entire record, we are hard-pressed to envision a case that is more deserving of the most severe punishment under our law. We are convinced that this case is precisely what the Legislature had in mind when it enacted the penalty of life imprisonment without the possibility of parole.

On November 14, 2001, the state gave timely notice of its intent to recommend such a sentence. Immediately after the jurors returned verdicts of guilty against Quinlan, the trial justice requested that they return to the jury room to determine whether the state had proven, beyond a reasonable doubt, that the murders were "committed in a manner involving torture or aggravated battery to the victim[s.]" G.L.1956 § 11–23–2(4). After further deliberations, the jury returned with a unanimous answer in the affirmative. At the consolidated sentencing hearing on May 28, 2003,[13] the trial justice was provided with letters written by Rafael Edwards

Ortega's mother, sister, stepfather, and grandmothers. Additionally, Michael Batista's father, stepfather, and sister addressed the court. The court heard from a Quinlan family friend and acknowledged receiving letters from two administrators at Quinlan's school. Counsel for both parties presented argument, and Quinlan addressed the court and denied his guilt. Thereafter, the trial justice imposed the aforementioned sentences of life without the possibility of parole. Based on the gruesome details of these crimes and the level of debauchery exhibited by this defendant, we need not travel far on this journey.

The record demonstrates that the trial justice carefully considered any aggravating or mitigating circumstances that gave rise to a sentence of life without the possibility of parole. He examined the nature of the offenses and balanced Quinlan's relative youth against his refusal to accept responsibility for these murders and his failure to show any real remorse. The trial justice not only agreed with the jury's finding of torture and aggravated battery, but he also noted that defendant conscripted his friends into helping dispose of the bag of hands and enticed them to lie. The trial justice concluded that "the depth and depravity of these two murderers knew no bounds." Finally, he rejected any suggestion that "drugs and alcohol were somehow at the root of the butchery" or in any way

13. General Laws 1956 § 12–19.2–4 provides:
 "**Consideration of aggravating and mitigating circumstances.**—At the presentence hearing, following a finding that one or more of the circumstances enumerated in § 11–23–2 or 11–23–2.1 as the basis for imposition of a sentence of life imprisonment without parole was involved in the first degree murder of which the defendant has been convicted, the court shall consider evidence regarding the nature and circumstances of the offense and the personal his-

 tory, character, record, and propensities of the defendant which are relevant to the sentencing determination. After hearing evidence and argument regarding the aggravating and mitigating circumstances relating to the offense and the defendant, the court shall, in its discretion, sentence the defendant to life imprisonment without parole or to life imprisonment. The court shall state on the record its reasons for imposing its sentence."

excused these crimes. The trial justice found that neither defendant was so drunk or so drugged that he lacked "the wherewithal to try to clean up the evidence, to sever hands, and to dispose of evidence in a dumpster."

Quinlan requests that we reduce his sentence to life imprisonment *with* the possibility of parole. We decline to do so. It is apparent that the trial justice, in considering the appropriate sentence for someone found guilty of "two of the most brutal murders that this Court has heard recounted in many years[,]" carefully considered the nature of the crimes as well as the personal character and propensities of the offender, and he concluded that "society needs to be protected from the likes of th[is] defendant[ ] for as long as possible." We agree with this evaluation.

We also take this opportunity to address the issue of whether the postmortem dismemberment of the victims' hands is a relevant factor on the issue of a sentence of life without the possibility of parole. Abundant evidence of torture and mayhem was introduced in this case, such that Ortega swallowed his teeth and blood while still alive, Batista's ear was dismembered, and his brain and scalp were "nearly pulverized." Therefore, we need not consider evidence of postmortem butchery on the element of torture and aggravated battery. Nonetheless, this brutality, as well as Quinlan's behavior after the murders, is relevant evidence reflective of whether he is capable of rehabilitation and, therefore, is part of the evidentiary landscape against which a sentence of life without the possibility of parole is evaluated.

After carefully reviewing the facts in this case, and in light of the horrifying and brutal nature of these crimes and the torture inflicted upon these victims, we are of the opinion that concurrent sentences of life imprisonment without the possibility of parole are entirely just and proper.

### Conclusion

For the foregoing reasons, the judgments of conviction are affirmed, and the papers are remanded to the Superior Court.